WOLFRAM PARTNERSHIP, LTD., Plaintiff and Counterdefendant-Appellant, v. LaSALLE NATIONAL BANK, as Trustee, *et al.*, Defendants and Counterplaintiffs and Third-Party Plaintiffs-Appellees (Duncan Henderson *et al.*, Third-Party Defendants-Appellants; Perillo BMW, Inc., *et al.*, Third-Party Defendants).

First District (3rd Division) No. 1—00—2202

Opinion filed December 19, 2001—Modified on denial of rehearing March 20, 2002.

William J. Harte, Ltd. (William J. Harte and Joan M. Mannix, of counsel), and Kelly Olson, of Michod, DeHaan & Richter, both of Chicago (Richard H. Ferri, of counsel), for appellants Wolfram Partnership, Ltd., Duncan Henderson and Deirdre Henderson.

Schiff, Hardin & Waite, of Chicago (Eugene J. Geekie, Jr., William Macy Aguiar, and Kristen E. Brown, of counsel), for appellees.

JUSTICE CERDA delivered the opinion of the court:
This case involves a dispute between plaintiff/counterdefendant,

The Wolfram Partnership, Ltd., an Illinois limited partnership; its general partners, third-party defendants Duncan Henderson and Deirdre Henderson (collectively Wolfram); defendants/counterplaintiffs/third-party plaintiffs LaSalle National Bank (LaSalle), as trustee of trust agreement dated July 25, 1966, and known as trust No. 19672 (the Trust), and the Trust's beneficiaries, Joan Schimel, Barbara Guinand, Garnet Guinand, Joan Guinand, and Richard Guinand (the Beneficiaries) (collectively defendants), concerning the parties' rights under a lease agreement covering the Trust *res* commonly known as 2834 North Halsted Street in Chicago (the Premises). Upon Wolfram's appeal of the entry of summary judgment in favor of defendants, we affirm in part, reverse in part, and remand for further proceedings.

## BACKGROUND

### Wolfram and Its Lease for the Premises

On April 24, 1984, Wolfram, which is engaged in the business of managing and leasing commercial real estate, executed a lease agreement (the Lease) with Ruth Guinard, the then sole beneficiary of the Trust, for use of the Premises for a five-year period commencing on May 1, 1984, and ending April 30, 1989. In relevant part, the Lease, paragraph 8, allowed Wolfram to sublease the Premises to a third party, without Ruth's consent, provided Wolfram "(a) [gave the Trust] immediate written notice of such *** subletting; and (b) [furnished the Trust] with an executed copy of such *** sublease at the time such instrument [was] executed."

Paragraph 18 of the Lease required Wolfram to maintain certain insurance coverage on the Premises which adequately protected the Trust's interest in the property. Under that paragraph, Wolfram agreed "that throughout the term of [the] lease it *** [would], at [its own] cost, keep all buildings and improvements situated on the *** premises insured against fire and extended coverage perils to the extent of the full insurable value of said buildings and improvements, provided Landlord shall remain as an additional insured under all insurance policies."

In the event Wolfram was in default of "any term, provision, or covenant" of the Lease, subject to certain exceptions not relevant here, paragraph 21 afforded Wolfram the opportunity to cure its default. In particular, Wolfram was required to cure its breach (1) within 30 days of receiving written notice thereof or (2) alternatively, if its default could not be reasonably cured within the 30-day period, to undertake curative efforts within that time frame and thereafter act with reasonable diligence and in good faith to remedy its noncompliance. If Wolfram failed to cure as directed, the Trust held

the right to declare Wolfram in default and could pursue a number of options, including termination of the Lease.

A rider agreement (the Rider) accompanying the Lease afforded Wolfram the option of renewing the lease agreement for an additional five years following the expiration of the original period. The Rider further granted Wolfram the option to purchase the Premises for $200,000 during the original lease term and, if applicable, for $250,000 during the renewal term.

### Wolfram's Subleases and the Lease Amendments

Almost immediately after its execution of the Lease, in June 1984, Wolfram subleased the Premises to 2834 North Halsted Street Corporation, d/b/a Wolf's Head Motors Limited (Wolf's Head), for a period commencing July 1, 1984, and ending April 30, 1989 (the Wolf's Head Sublease). As mandated by the Lease, Wolfram provided timely notice of the Wolf's Head Sublease to Ruth.

Wolf's Head occupied the Premises from July 1984 until early 1987, when the business was sold to Steven Flaxman, who thereafter ran the business as Wolfram Motors. Wolfram and Wolfram Motors executed an agreement on April 30, 1987, for Wolfram Motors' sublease of the Premises for a period commencing June 1, 1987, and ending April 30, 1994 (the Wolfram Motors Sublease).

On April 29, 1987, the day prior to the execution of the Wolfram Motors Sublease, Wolfram and Ruth executed a document entitled "Owner's Consent" in which the parties agreed to extend the original lease term to April 30, 1994. While the Owner's Consent references the Wolfram Motors Sublease, the record does not reveal whether the sublease instrument accompanied the Owner's Consent or whether Ruth was otherwise presented a copy of that instrument for her perusal. In a separate instrument executed a short time thereafter, the parties amended the Lease to increase the monthly rent paid by Wolfram.

Wolfram Motors occupied the Premises until early 1990, when the business was sold to Perillo BMW, Inc. (Perillo BMW). On June 25, 1990, Wolfram and Perillo BMW entered into an agreement whereby Perillo BMW subleased the Premises for a period commencing on July 1, 1990, and ending April 30, 1994 (the 1990 Perillo Sublease). There is no indication in the record materials that Ruth ever received a copy of the 1990 Perillo Sublease or was otherwise notified of that agreement.

Also in June 1991, and following Wolfram's execution of the Perillo BMW sublease, Wolfram and Ruth again amended the Lease (the 1991 Amendment). In a formal amendment executed June 15,

1991, the parties agreed to extend the original lease term to April 30, 2004. The parties further agreed to an increase in the option price. The price was set at "$225,000 from May 1, 1991 through April 30, 1994, *** $250,000 from May 1, 1999 through April 30, 1999, and *** $275,000 from May 1, 1999 through April 30, 2004." To exercise its option, Wolfram was required to "deposit with Chicago Title and Trust the sum specified in *** Escrow Instructions," a document which was executed by the parties contemporaneously with the amendatory instrument. Per the escrow instructions, Wolfram was to deposit the following:

> "$ ____*____ all or part of which may be proceeds of a loan said sum to be deposited under the terms of separate money lenders instructions attached hereto and made a part hereof.
>
> * * *
>
> \* $225,000.00 on or before April 30, 1994; or
> \* $250,000.00 if after April 30, 1994 but before May 1, 1999; or
> \* $275,000.00 if after April 30, 1999 but before May 1, 2004."

### Ruth's Death and Wolfram's Additional Subleases with Perillo BMW

Ruth died on March 5, 1993. The record indicates Ruth's daughter, Joan Schimel, who acted as executrix of Ruth's estate, undertook the primary responsibility of administering Wolfram's lease of the Premises. By letter dated April 20, 1993, and written by Joan's son, Fred Schimel, Wolfram was notified of Ruth's death and instructed to remit all future rental payments for the Premises to Joan.

Notably, at some point shortly after Ruth's death, Fred discussed with legal counsel the feasibility of breaking the Lease. According to Joan, Fred believed the rent paid by Wolfram, as well as the option prices, was unfairly low. While Fred asked counsel to look into the matter, the Beneficiaries never took any steps to cancel or otherwise defeat the lease agreement. Rather, the Beneficiaries continued to accept Wolfram's monthly rental payments.

The 1990 Perillo Sublease expired on April 30, 1994. The record indicates that Perillo BMW continued to occupy the Premises as a month-to-month subtenant through March 1995. On March 11, 1995, Wolfram and Perillo BMW entered into a second sublease for a term commencing on March 31, 1995, and ending March 31, 1997 (the 1995 Perillo Sublease). The two-year term set forth in the 1995 Perillo Sublease was extended by the parties on March 19, 1997, for another year, until March 31, 1998 (the 1997 Perillo Sublease Extension). The record materials fail to show that Wolfram notified Joan or any other

Trust representative of either of the foregoing Perillo sublease documents.

The 1997 Perillo Sublease Extension expired, as provided, on March 31, 1998. From that time until the present, Perillo BMW has apparently occupied the Premises as a month-to-month subtenant.

### Wolfram's Intention to Purchase the Premises and the Beneficiaries' Assertions of Default

In early 1999, Wolfram notified the Beneficiaries of its intention to purchase the Premises for $250,000, the option price in effect at the time under the 1991 Amendment.

Shortly thereafter, on February 3, 1999, Fred wrote Wolfram to advise it that the requisite escrow deposit of the full purchase price had not been made. Wolfram responded by depositing $50,000 of the $250,000 purchase price on February 5, 1999. Wolfram further, on or about the same date, reached an agreement with Perillo BMW for the sale of the Premises.

Between March 2 and 8, 1999, Wolfram and Fred exchanged numerous correspondences in which the parties addressed the amount of Wolfram's deposit and the possibility of allowing that deposit to stand, despite it being less than the amount required, with the understanding that the deposit would be nonrefundable. In part, Fred informed Wolfram that the $50,000 deposit proposed was "quite substantial and would likely be acceptable to the Trust and its beneficiaries subject to the non-refundable terms of the deposit." While Fred expressed his concerns that no formal agreement had been reached regarding the matter, he nonetheless advised Wolfram of his willingness to accept the deposit in lieu of the full purchase price.

After Wolfram requested Fred to submit the necessary documentation so an amendment to the escrow instructions could be prepared reflecting the Trust's acceptance of a nonrefundable deposit of $50,000, the parties undertook steps to close on the Premises. Fred, in particular, contacted Chicago Title on March 17, 1999, and requested the preparation and certification of several copies of an updated ALTA survey of the Premises reflecting the title company as Chicago Title, the seller as LaSalle, as trustee of the Trust, and the purchaser as Wolfram. The record further indicates that Wolfram scheduled a closing to take place on May 26, 1999.

By letter dated April 1, 1999, Joan notified Wolfram that it was in "default under Sections 8 and 18 of the Lease." While asserting a default, Joan's letter does not provide any insight as to the specific nature of Wolfram's asserted noncompliance. Joan expressly advised Wolfram that its "failure to timely cure such default shall result in [the Trust] exercising its rights under Section 21 of the Lease."

Deirdre responded by sending Fred a fax on April 20, 1999. The fax references discussions Deirdre had with Fred on April 19, 1999, and was accompanied by a certificate of insurance issued to Deirdre on April 16, 1999, by the insurance agency of DeCarl, Levine & Friedman, Ltd. (the DeCarl Agency). This certificate lists "Joseph Perillo," the sole owner of Perillo BMW, as the named insured under a policy of insurance, effective from December 30, 1998, to December 30, 1999, that provided coverage for, *inter alia*, a building on the Premises. Deirdre further advised Fred that "the other item you mentioned will be forthcoming shortly."

Two days after Deirdre's fax, on April 22, 1999, Wolfram deposited the remaining $200,000 of the option price into escrow.

At some point after her initial fax, Deirdre sent Fred copies of the 1995 Perillo Sublease and the 1997 Perillo Sublease Extension. There is no indication that the 1990 Perillo Sublease either accompanied Deirdre's correspondence or was thereafter sent to Fred or any other Trust representative.

The May 26 closing did not go forth as scheduled. Shortly thereafter, on June 3, 1999, the Beneficiaries notified Wolfram they were not going forward with the sale of the Premises because Wolfram had assertedly failed to timely cure its defaults. The Beneficiaries advised Wolfram they were terminating the lease agreement and demanded Wolfram, as well as Perillo BMW, surrender immediate possession of the Premises.

### The Present Litigation

Wolfram responded by commencing the instant action for declaratory, injunctive and other relief.[1] Count I of Wolfram's amended complaint essentially seeks a declaration that Wolfram has materially complied with its lease obligations, particularly those imposed under paragraphs 8 and 18, that it has properly and effectively exercised its option to purchase the Premises, that defendants' termination of the Lease was unjustified and that defendants are in breach of the parties' agreements by failing to recognize Wolfram's right to purchase. In count II, Wolfram seeks specific performance of its option, while count III requests monetary damages for defendants' alleged failure to act fairly and in good faith in administering the Lease provisions.

Defendants timely answered the amended complaint and filed a 10-count countercomplaint against Wolfram, asserting, in relevant part, claims for breach of paragraphs 8 and 18 of the lease agreement (counts VIII and IX) and an action for forcible entry and detainer (count IV).

---

[1]Wolfram's complaint is also directed against Perillo BMW. That claim, however, is not relevant to the disposition of the instant appeal.

Wolfram thereafter moved for summary judgment on all counts of its amended complaint as well as on all claims asserted by defendants in their countercomplaint. Defendants countered by seeking partial summary judgment on count I of the amended complaint and counts IV, VIII and IX of their countercomplaint. Following a hearing, the circuit court denied Wolfram's motion in its entirety and granted defendants' request for partial summary judgment. The instant appeal followed.

## ANALYSIS

■ The purpose of summary judgment is to determine whether any genuine issues of material fact exist between the parties. *Hubble v. O'Connor*, 291 Ill. App. 3d 974, 979, 684 N.E.2d 816, 820 (1997). Summary judgment is proper only where the pleadings, depositions, and admissions on file, together with any affidavits, present no genuine issue of material fact and show that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2—1005(c) (West 1998). A triable issue of fact precluding summary judgment exists "where there is a dispute as to material facts, or where, the material facts being undisputed, reasonable persons might draw different inferences from the facts." *Northern Trust Co. v. St. Francis Hospital*, 168 Ill. App. 3d 270, 276, 522 N.E.2d 699, 703 (1988).

■ By filing cross-motions for summary judgment, the parties invite the court to determine the issues as a matter of law and posit that judgment in favor of one of the parties is proper. *Hubble*, 291 Ill. App. 3d at 979, 684 N.E.2d at 820; *Maywood Proviso State Bank v. York State Bank & Trust Co.*, 252 Ill. App. 3d 164, 171, 625 N.E.2d 83, 89 (1993). Yet, the mere filing of cross-motions does not preclude a determination that triable questions of fact exist. *Andrews v. Cramer*, 256 Ill. App. 3d 766, 769, 629 N.E.2d 133, 135 (1993).

■ Our review of an order granting summary judgment is conducted *de novo* (*John Deere Insurance Co. v. Allstate Insurance Co.*, 298 Ill. App. 3d 371, 376, 698 N.E.2d 635, 639 (1998)), and the record materials, including all pleadings, depositions and affidavits will be construed in a light most favorable to the nonmoving party. *Soderlund Brothers, Inc. v. Carrier Corp.*, 278 Ill. App. 3d 606, 614, 663 N.E.2d 1, 7 (1995).

In moving for partial summary judgment, defendants claim the undisputed evidence shows Wolfram was in breach of paragraphs 8 and 18 of the Lease at the time default was declared in April 1999. According to defendants, the evidence clearly establishes Wolfram, in violation of paragraph 8, never gave the Trust immediate written notice or executed copies of any of the Perillo sublease documents. With

respect to Wolfram's asserted default of paragraph 18, defendants claim Wolfram has failed to maintain the proper insurance on the Premises since 1995 when it allowed Perillo BMW to obtain the necessary insurance coverage. In light of Wolfram's noncompliance, defendants contend they had the right to declare a default and demand Wolfram to undertake efforts to cure its noncompliance. Because, according to defendants, Wolfram failed to cure as required, and since Wolfram's breaches were material to the parties' agreement, the Lease was properly terminated and, accordingly, Wolfram's option to purchase the Premises is noneffective.

■ Wolfram refutes defendants' claims of default and, conversely, maintains the undisputed evidence shows that proper and timely notification of all Perillo sublease documents was given and that the Premises were, at all relevant times, adequately protected by insurance. Assuming, *arguendo*, its breach of the Lease, Wolfram asserts (1) it sufficiently cured its defaults, (2) any breach was not material and, thus, did not warrant the Lease's termination, and/or (3) equity precludes defendants from declaring a default and, thereby, terminating the parties' agreement in order to avoid Wolfram's option to purchase.[2]

Before addressing the respective arguments raised by the parties, we initially comment on Wolfram's exercise of its option and the effect that action may have on the parties' litigation.

### Wolfram's Option To Purchase

■ An option to purchase contained in a lease has been described as a contract by which the lessor-owner grants the lessee the right to purchase the premises at a fixed price within a certain time frame. *Keogh v. Peck*, 316 Ill. 318, 328, 147 N.E. 266, 269 (1925); *Bruss v. Klein*, 210 Ill. App. 3d 72, 79, 568 N.E.2d 904, 908 (1991). The option,

---

[2] In their appellate brief, defendants address the question of whether the trial court properly denied Wolfram's motion *in its entirety* and they urge this court to affirm that ruling. Ordinarily, the denial of a motion for summary judgment is not a final judgment and, thus, not appealable. *Chavda v. Wolak*, 188 Ill. 2d 394, 403, 721 N.E.2d 1137, 1143 (1999); *Pagano v. Occidental Chemical Corp.*, 257 Ill. App. 3d 905, 909, 629 N.E.2d 569, 573 (1994). Yet, review of an order denying a motion for summary judgment is proper where the order also granted a cross-motion for summary judgment on the same claim or claims subject to the motion that was denied. *Chavda*, 188 Ill. 2d at 403, 721 N.E.2d at 1143; *Fremont Casualty Insurance Co. v. Ace-Chicago Great Dane Corp.*, 317 Ill. App. 3d 67, 72, 739 N.E.2d 85, 89 (2000). Accordingly, our review with respect to the court's denial of Wolfram's motion is limited to whether Wolfram should have been granted summary judgment on count I of its complaint.

when accepted and exercised according to its terms, becomes a present contract for the sale of the property and the lease agreement extinguishes, thereby transforming the parties' relationship from lessor-lessee to vendor-vendee. *Cities Service Oil Co. v. Viering*, 404 Ill. 538, 554, 89 N.E.2d 392, 402 (1949); *Industrial Steel Construction, Inc. v. Mooncotch*, 264 Ill. App. 3d 507, 511-12, 637 N.E.2d 663, 666 (1994); *Hanson v. Duffy*, 106 Ill. App. 3d 727, 730-31, 435 N.E.2d 1373, 1377 (1982). The property under contract is regarded, in equity, as that of the vendee, and the rights of the parties are thereafter governed by the terms of sale. *Cities Service Oil*, 404 Ill. at 555, 89 N.E.2d at 402; *Mooncotch*, 264 Ill. App. 3d at 512, 637 N.E.2d at 666.

■ The lessee must exercise the option in strict conformity with all conditions prescribed and not waived by the lessor. *Lake Shore Country Club v. Brand*, 339 Ill. 504, 522, 171 N.E. 494, 501 (1930); *Bruss*, 210 Ill. App. 3d at 79, 568 N.E.2d at 908. The failure of the lessee to exercise the option as prescribed is ineffective to create a binding sale contract (49 Am. Jur. 2d *Landlord & Tenant* § 402, at 349 (1995)), and, in such a case, the lease and the parties' relationship as landlord-tenant continue. If the lessor thereafter effectuates a legal termination of the lease agreement, the option, and accordingly the tenant's right to purchase the property, will also be extinguished. *Bond v. Long*, 338 Ill. App. 1, 3, 86 N.E.2d 585, 587 (1949); *Sandra Frocks, Inc. v. Ziff*, 397 Ill. 497, 504, 74 N.E.2d 699, 704 (1947).

Conversely, where the leasehold is terminated by the proper exercise of the option, the lessor loses any right it may have held under the lease to declare a forfeiture. *Cole v. Ignatius*, 114 Ill. App. 3d 66, 73, 448 N.E.2d 538, 544 (1983). Likewise, the lessor will be precluded from attempting to defeat the option by declaring a forfeiture based on a breach that occurred either prior to or after the option was exercised. 51C C.J.S. *Landlord & Tenant* § 82(1)(b), at 246 (1968); 49 Am. Jur. 2d *Landlord & Tenant* § 431, at 369 (1995).

The undisputed evidence here establishes Wolfram informed the Trust of its intention to purchase the Premises in early 1999, at which time the option price was $250,000. Per the terms of the 1991 Amendment, Wolfram, upon exercising its option, was to deposit the $250,000 purchase price into an escrow. Only upon deposit of the applicable sum would the option be exercised in accordance with the parties' agreements. Wolfram, however, made a deposit of only $50,000 on February 5, 1999. Several correspondences between Wolfram and Fred during the early part of March 1999 suggest the parties had discussed, and possibly agreed upon, modifying the escrow agreement to permit Wolfram's $50,000 deposit to stand in lieu of making the deposit nonrefundable. Around the same time, and shortly before Joan's April

1999 letter of default, Wolfram and Fred each undertook steps in preparation for closing on the property.

In light of the above, we are unable to determine as a matter of law whether Wolfram's option was properly exercised. If the parties did, in fact, modify the escrow materials to allow Wolfram to deposit an amount different from that specified in the original instrument, and Wolfram satisfied those amended prescriptions, the Lease could have extinguished prior to defendants' declaration of default and, consequently, defendants' declaration and asserted termination of the Lease would be ineffective to avoid Wolfram's option to purchase the Premises. If that is the case, Wolfram's proper exercise of the option would have created a mutually binding sale agreement between the parties.[3]

If, on the other hand, Wolfram's option was not properly exercised, then no contract of sale arose between the parties and the Lease, and Wolfram's obligations thereunder continued. In such instance, defendants could declare a default, provided they did not waive their right to do so, and could assert a forfeiture in the event that default was not adequately remedied by Wolfram. Based on the record, we find a question of fact exists as to whether Wolfram exercised its option in accordance with the parties' understanding.

In its petition for rehearing, Wolfram asserts it was not required under the parties' written agreements to deposit the full $250,000 purchase price upon exercising its option. Rather, according to Wolfram, the clear terms of the 1991 Amendment and escrow instructions mandated only that the required deposit be made by May 1, 1999, which was done when Wolfram deposited the remaining $200,000 on April 22, 1999. Wolfram argues that irrespective of any question regarding the parties' modification of the option terms, the undisputed facts show that it exercised its option in accordance with the terms of the option as originally agreed upon.

The pivotal inquiry here, however, is whether Wolfram satisfied all conditions of the option prior to defendants' declaration of default. The fact Wolfram may have deposited the full purchase price by a specified due date will be of no consequence if Wolfram's strict compliance with the option terms, as originally agreed upon, was lacking before it was declared to be in breach of the Lease. Indeed, while

---

[3]Significantly, Wolfram's option right is not conditioned upon compliance with its obligations under the Lease. Hence, Wolfram's alleged default prior to the exercise of its option would not affect its right to purchase the Premises where no forfeiture had been declared. See 49 Am. Jur. 2d *Landlord & Tenant* § 427, at 367 (1995).

Wolfram paid the remaining balance on April 22, 1999, before the asserted May 1, 1999, due date, Wolfram's payment was nonetheless well after defendant's April 1 declaration of default. Contrary to Wolfram's suggestion, its payment of the remaining balance on April 22 does nothing to negate defendant's default declaration.

### Wolfram's Compliance Under Paragraph 8 of the Lease

The record contains no direct evidence showing Ruth or any representative of the Trust was notified of the Perillo sublease documents as required by the terms of the Lease. Indeed, Wolfram never claims any such evidence exists.[4] Rather, Wolfram maintains that a question of fact exists as to whether it notified Ruth of the 1990 Perillo Sublease. In support thereof, Wolfram relies solely on the deposition testimony of Duncan Henderson in which Duncan stated that while he had no specific recollection of providing Ruth a copy of the 1990 Perillo Sublease, he "believed" such notice was given because such notification would have been consistent with his prior actions in tendering the Wolf's Head and Wolfram Motors subleases. According to Duncan, he could simply "speculate" that he had provided Ruth with the requisite information.

■ We find the inference Wolfram seeks to raise is not a reasonable one. For a party opposing summary judgment to rely on an inference to create the necessary question of fact, the inference sought to be drawn must itself be reasonable based on the evidence presented. See *Consolino v. Thompson*, 127 Ill. App. 3d 31, 33, 468 N.E.2d 422, 424 (1984). A finding that notice of the 1990 Perillo Sublease was given does not reasonably follow from the mere fact that Wolfram may have previously tendered the requisite notification of other subleases. Such a conclusion is wholly speculative.

Our above finding aside, Wolfram significantly never argues that a question of fact exists as to whether notice of the other Perillo sublease documents was tendered. Based on the foregoing, we conclude as a matter of law that Wolfram was in breach of paragraph 8 of the lease agreement.[5]

---

[4]In an affidavit submitted in support of Wolfram's motion, Duncan avers only that Wolfram informed the Trust of the Wolf's Head and Wolfram Motors subleases. Duncan never addresses the matter of notice of the Perillo sublease documents.

[5]Wolfram additionally focuses on the asserted lack of prejudice to the Trust by any failure on its part to provide notice of the 1990 Perillo Sublease. In short, Wolfram claims Ruth's interests were not prejudiced since Ruth was assertedly aware of the terms of the 1990 instrument. Not only does Wolfram's

## Wolfram's Compliance Under Paragraph 18 of the Lease

Defendants additionally claim Wolfram has been in breach of the Lease since 1995 by failing to obtain property insurance commensurate with the coverage required by paragraph 18. The record indicates Wolfram had obtained insurance coverage for the Premises up until March 1995. Thereafter, from March 31, 1995, to and through December 30, 2000, Joe Perillo, in his individual capacity, obtained the insurance for the Premises.[6] The insurance materials contained in the record reveal that, on each of the policies of insurance issued during the foregoing time period, Perillo was the named insured while the Trust was listed as an additional insured.

Defendants' principal contention in moving for summary judgment on this issue is that the insurance coverage personally procured by Perillo has been and is insufficient to protect the Trust's interests because Perillo lacks an insurable interest in the Premises. Defendants contend Perillo's lack of insurable interest renders any and all policies procured by him void and, as a result, claim insurance coverage for the Premises has effectively been nonexistent since 1995.

We find the question of whether Perillo possessed an insurable interest during the period in question is of no consequence in determining Wolfram's compliance under paragraph 18 since the record unequivocally demonstrates that the Trust's interests in the Premises have, at all relevant times, been adequately protected by Perillo's insurance. The Trust has been included as an additional insured under all policies of insurance obtained and in effect during the time period in question. Clearly, the Trust, as owner of the Premises and the structures thereupon, had an insurable interest under Perillo's policies.

While a lack of an insurable interest will ordinarily render a policy of insurance void and unenforceable on public policy grounds (*Hawkeye Security Insurance Co. v. Reeg*, 128 Ill. App. 3d 352, 354, 470 N.E.2d 1103, 1105 (1984); 22 Ill. L. & Prac. *Insurance* § 104, at 208 (1999)), "[w]here there are several insureds under a policy, and all do not have the requisite insurable interest, the policy is invalid only as to those lacking [an] insurable interest." 3 Couch on Insurance 3d § 41:2, at 41-8 (1995). Thus, assuming Perillo lacked the necessary

contention fail to address notice of the other Perillo sublease documents, it does nothing to demonstrate compliance with paragraph 8.

[6]Pursuant to the terms of the 1995 sublease, Wolfram permitted Perillo BMW, if it desired, to obtain insurance for the Premises provided such coverage was commensurate with the obligations imposed upon Wolfram under paragraph 18 of the Lease.

insurable interest during the period in question, that fact would not have compromised the validity of coverage afforded the Trust under the insurance procured.[7]

Because the evidence shows that the Trust's interests in the Premises, at all relevant times, have been adequately protected by the policies of insurance procured by Perillo, we conclude as a matter of law that Wolfram was not in default of its insurance obligations under paragraph 18.

### Sufficiency of Wolfram's Efforts to Cure its Default of Paragraph 8

Per paragraph 21 of the Lease, Wolfram had 30 days from its receipt of Joan's letter in which to cure its default of paragraph 8 by sending Joan or another representative of the Trust copies of the Perillo sublease materials or, if that was not reasonably practicable, to undertake timely efforts to do so within the foregoing 30-day period and thereafter act with reasonable diligence and in good faith to ensure said documents were tendered.

While the record raises a factual question as to whether Wolfram cured its noncompliance of paragraph 8 by sending Fred copies of the 1995 and 1997 Perillo sublease documents, the undisputed evidence shows Wolfram never provided Fred or any other Trust representative with a copy of the 1990 Perillo Sublease following the declaration of default. Wolfram merely offers the bald assertion that Deirdre "provided defendants with the 1990 Perillo Sublease" following transmittal of the 1995 and 1997 sublease documents.

Wolfram contends defendants are precluded by the doctrine of unclean hands from asserting a failure to cure because the default letter sent by Joan was "purposely vague and evasive," so as to hinder Wolfram's curative efforts. In support thereof, Wolfram cites Deirdre's deposition testimony in which she indicated her failure to understand the nature of Wolfram's asserted default from Joan's letter. Deirdre explained she attempted to clarify the matter with Fred but that Fred did not respond to any of her inquiries. After discussions with her husband and counsel, Deirdre decided to send Fred copies of the 1995 and 1997 sublease documents.

■ The equitable doctrine of unclean hands precludes a party who

---

[7]Defendants suggest Perillo's procurement of the insurance did not satisfy Wolfram's lease obligation because the terms of the 1995 Perillo Sublease permitted only Perillo BMW, as sublessee, and not Perillo personally, to purchase the necessary coverage. Defendants essentially assert a breach of the sublease agreement between Wolfram and Perillo BMW, a matter wholly irrelevant to the instant analysis and of which defendants have no standing to complain.

has been guilty of misconduct amounting to fraud or bad faith connected to the subject matter of the litigation from seeking any relief from a court in equity. *La Salle National Bank v. 53rd-Ellis Currency Exchange, Inc.,* 249 Ill. App. 3d 415, 437-38, 618 N.E.2d 1103, 1119 (1993); *O'Brien v. Cacciatore,* 227 Ill. App. 3d 836, 846, 591 N.E.2d 1384, 1390 (1992). Joan's letter of default was undoubtedly vague in that while it claimed a breach under paragraph 8, it never specified the nature of that breach. Deirdre contacted Fred to ascertain the specific nature of Wolfram's noncompliance. While Deirdre testified her inquiries with Fred went unanswered and, thus, intimates she had no contact with Fred concerning the nature of the default letter, the record shows otherwise. As previously detailed, Deirdre sent Fred correspondences in late April and again in early May following Joan's letter in which she specifically referenced conversations between the parties concerning Wolfram's expected response to the default notice and explicitly indicated they were being sent in response to those discussions.

To the extent Wolfram is claiming fraud on the part of defendants simply on the basis of Joan's vague letter of default, we stress Deirdre, specifically seeking clarification of Wolfram's asserted noncompliance, had discussions with Fred regarding the Beneficiaries' expectations. As shown by the documentary evidence, Deirdre did not rely solely on Joan's assertions of default in undertaking efforts to remedy Wolfram's noncompliance.

 Based on the record, we conclude as a matter of law that a copy of the 1990 Perillo Sublease was never sent by Wolfram in response to Joan's letter and, consequently, Wolfram did not cure its default of paragraph 8 in this respect. We further find the evidence insufficient to either establish or raise a factual issue as to whether the Trust representatives acted fraudulently or in bad faith in asserting a default or in responding to Deirdre's inquiries regarding the nature of Wolfram's noncompliance.

### The Materiality of Wolfram's Noncompliance With Paragraph 8 of the Lease

According to the terms of the Lease, the Trust could terminate the parties' agreement for any default that Wolfram failed to timely cure or, if a timely cure was not practicable, for which Wolfram failed to undertake timely and reasonable remedial efforts. By its express terms, termination of the Lease could stem from any breach by Wolfram, irrespective of that breach's significance.

 Regardless of the language used by the parties, a breach, to justify a premature termination or forfeiture of a lease agreement,

must have been material or substantial. *First National Bank of Evergreen Park v. Chrysler Realty Corp.*, 168 Ill. App. 3d 784, 793, 522 N.E.2d 1298, 1303 (1988); see also *Mann v. Mann*, 283 Ill. App. 3d 915, 922, 671 N.E.2d 73, 78 (1996) (immaterial breach did not warrant termination of lease agreement); 51C C.J.S. *Landlord & Tenant* § 104, at 337 (1968) (to justify termination of a lease upon the lessee's breach, "the violation must be substantial, and trivial or technical breaches of covenants [are] insufficient"); *Commercial Leases: Application of Rule That Lease May Be Cancelled Only For "Material" Breach*, 54 A.L.R.4th 595, 604 (1987).

■ A breach is material where the covenant breached is one of such importance that the contract would not have been entered into without it. *Galesburg Clinic Ass'n v. West*, 302 Ill. App. 3d 1016, 1019, 706 N.E.2d 1035, 1037 (1999); *United States Fidelity & Guaranty Co. v. Old Orchard Plaza Ltd. Partnership*, 284 Ill. App. 3d 765, 776, 672 N.E.2d 876, 884 (1996). Because the determination of whether a breach is "material" depends on the inherent justice of the matter and presents "a complicated question of fact" involving consideration of several factors (*Kel-Keef Enterprises, Inc. v. Quality Components Corp.*, 316 Ill. App. 3d 998, 1016-17, 738 N.E.2d 524, 537 (2000); see also *Israel v. National Canada Corp.*, 276 Ill. App. 3d 454, 461, 658 N.E.2d 1184, 1190 (1995)), resolution of this issue is generally not appropriate at the summary judgment stage and, accordingly, we find an issue of fact exists as to whether Wolfram's noncompliance with paragraph 8 constituted a material breach of the parties' lease agreement.

### Existence of Equitable Defenses to Preclude Defendants from Declaring A Default and Termination of the Lease

Wolfram argues defendants have waived by their conduct any right to declare a forfeiture of the Lease based on its failure to tender the proper notification of the Perillo sublease instruments.

■ Waiver is the express or implied voluntary and intentional relinquishment of a known and existing right. *Galesburg Clinic*, 302 Ill. App. 3d at 1019, 706 N.E.2d at 1037; *Lake County Grading Co. of Libertyville, Inc. v. Advance Mechanical Contractors, Inc.*, 275 Ill. App. 3d 452, 462, 654 N.E.2d 1109, 1118 (1995). Parties to a contract may waive provisions contained in the contract for their benefit and such waiver may be established by conduct indicating that strict compliance with those contractual provisions will not be required. *Whalen v. K mart Corp.*, 166 Ill. App. 3d 339, 343, 519 N.E.2d 991, 994 (1988). The doctrine serves to prevent the waiving party from lulling another into a false belief that strict compliance with a contractual obligation

will not be required and then suing for noncompliance. *Lake County Grading Co.*, 275 Ill. App. 3d at 463, 654 N.E.2d at 1118; *Wagner Excello Foods, Inc. v. Fearn International, Inc.*, 235 Ill. App. 3d 224, 233, 601 N.E.2d 956, 962 (1992); 12 Ill. L & Prac. *Contracts* § 452, at 314 (1983).

Here, Wolfram asserts defendants impliedly waived their right to demand strict compliance with the notice requirements of paragraph 8. An implied waiver may arise when conduct of the person against whom waiver is asserted is inconsistent with any other intention than to waive it. *Whalen*, 166 Ill. App. 3d at 343, 519 N.E.2d at 994. Implied waiver has been viewed as a concept based upon either waiver or estoppel[8] and, accordingly, has been stated to arise where (1) an unexpressed intention to waive can be clearly inferred from the circumstances or (2) the conduct of the waiving party has misled the other party into a reasonable belief that a waiver has occurred. *Batterman v. Consumers Illinois Water Co.*, 261 Ill. App. 3d 319, 321, 634 N.E.2d 1235, 1236 (1994); *Lavelle v. Dominick's Finer Foods, Inc.*, 227 Ill. App. 3d 764, 771, 592 N.E.2d 287, 291-92 (1992).

In the context of lessor-lessee relationships, our supreme court has stated "[i]t has long been established that any act of a landlord which affirms the existence of a lease and recognizes a tenant as his lessee after the landlord has knowledge of a breach of lease results in the landlord's waiving his right to forfeiture of the lease." *Midland Management Co. v. Helgason*, 158 Ill. 2d 98, 102, 630 N.E.2d 836, 839 (1994); see also *McGill v. Wire Sales Co.*, 175 Ill. App. 3d 56, 59, 529 N.E.2d 682, 684 (1988). Any conduct inconsistent with a declaration of a lease's termination may be sufficient to establish waiver of the breach, such as the acceptance of rent accruing subsequent to the breach.[9] *Midland Management Co.*, 158 Ill. 2d at 102, 630 N.E.2d at 839. Where the lessor waives a lessee's default, which could have given rise to the termination of the lease agreement, by an act inconsistent with a declaration of forfeiture, the lease continues in force (*La Salle National Bank v. Khan*, 191 Ill. App. 3d 41, 44, 547 N.E.2d

---

[8]While Wolfram asserts a separate claim based upon estoppel principles, that claim essentially amounts to one of waiver and will be treated as such for purposes of our opinion.

[9]Indeed, the acceptance of rent following a breach has long been considered to be highly indicative of an intention to waive. See *Midland Management*, 158 Ill. 2d at 102, 630 N.E.2d at 839; *Vulcan Materials Co. v. Holzhauer*, 234 Ill. App. 3d 444, 451, 599 N.E.2d 449, 454 (1992); *McGill*, 175 Ill. App. 3d at 60, 529 N.E.2d at 685; *Steven W. Barrick & Associates v. Witz*, 147 Ill. App. 3d 615, 619, 498 N.E.2d 738, 742 (1986); 24 Ill. L. & Prac. *Landlord & Tenant* § 241, at 301 (1980).

472, 474 (1989)), and the lessor cannot later rely upon the waived default to defeat either the parties' agreement (12A Ill. L. & Prac. *Contracts* § 464, at 332 (1983); 24 Ill. L. & Prac. *Landlord & Tenant* § 239, at 297 (1980)), or an option to purchase granted therein. *Steven W. Barrick & Associates v. Witz*, 147 Ill. App. 3d 615, 617-18, 498 N.E.2d 738, 740 (1986).

■ While the question of waiver may be resolved as a legal matter in certain cases, the question becomes one of fact where the facts necessary to support a finding of waiver are disputed or reasonable minds could draw different inferences from the evidence. *Pantle v. Industrial Comm'n*, 61 Ill. 2d 365, 369, 335 N.E.2d 491, 494 (1975); *Lake County Grading Co.*, 275 Ill. App. 3d at 463, 654 N.E.2d at 1119.

The record clearly demonstrates defendants were aware of Perillo BMW's subtenancy prior to sending the April 1999 letter of default. While Joan testified at her deposition that she learned that Perillo BMW was operating on the Premises at some point in 1995, defendants' discovery response to Wolfram's first request to admit states that the Beneficiaries knew of Perillo BMW's occupancy in 1993. Defendants additionally acknowledge they continuously accepted monthly rental payments from Wolfram following Ruth's death in March 1993 up until the time of the Lease's termination in mid-1999. Noteworthy in this regard is Joan's statement that, upon learning of Perillo BMW's occupancy, she never inquired of Wolfram as to the nature of Wolfram's sublease agreement with Perillo BMW and further never requested Wolfram to provide a copy of such agreement.

While defendants knew Perillo BMW was subleasing the Premises as early as 1993, questions remain as to whether defendants knew or should have known that Wolfram and Perillo BMW had executed written subleases for the Premises and, if so, whether they knew or should have known that no notice of those instruments had been tendered pursuant to the terms of the Lease. See 12A Ill. L. & Prac. *Contracts* § 453, at 316 (1983) (the acts or circumstances relied upon to constitute waiver must have transpired or been performed after the party against whom waiver is sought knew or should have known of the facts constituting the breach). Accordingly, we find an issue of fact exists as to whether defendants waived their right to declare Wolfram in default and to rely on that default in terminating the Lease.[10]

---

[10]Wolfram additionally asserts defendants are barred from seeking a forfeiture pursuant to the doctrines of ratification and *laches*. Wolfram's ratification argument is essentially a claim of waiver, and its claim that *laches* applies is misplaced because Wolfram is not invoking that doctrine to bar defendants'

## CONCLUSION

In sum, initial consideration must be given to whether Wolfram's exercise of its option to purchase the Premises was in accordance with the parties' understandings. That issue aside, we find as a matter of law that Wolfram was in breach of paragraph 8 of the Lease for failing to timely tender the Perillo sublease documents to defendants. A factual issue, however, exists as to whether Wolfram's default was material and, hence, whether defendants were justified in terminating the Lease. While Wolfram's efforts to cure its noncompliance were ineffective as a matter of law, that fact becomes relevant only if Wolfram's breach is deemed to be material and defendants are found not to have waived their right to rely on that breach to declare a forfeiture of the parties' agreement.

Thus, for the foregoing reasons, the portion of the circuit court's order granting defendants' motion for partial summary judgment on count I of the amended complaint and counts IV, VII and IX of defendants' countercomplaint is reversed, while the portion of that order denying Wolfram's motion for summary judgment on all counts of its complaint and on all counterclaims is affirmed. The cause is remanded for further proceedings.

Affirmed in part and reversed in part; cause remanded.

HALL, P.J., and WOLFSON, J., concur.

---

counterclaims but, rather, to prevent defendants from asserting a forfeiture of the lease agreement. See *Malatesta v. Mitsubishi Aircraft International, Inc.*, 275 Ill. App. 3d 370, 386, 655 N.E.2d 1093, 1104 (1995) (stating that the doctrine of *laches* is "an affirmative defense" and, therefore, holding that the doctrine was unavailable to an intervener-insurance company since it was not a defendant); 30A C.J.S. *Equity* § 128, at 352 (1992) (while a plaintiff may assert *laches* against a defendant which seeks affirmative relief through a cross-claim, a "plaintiff cannot urge *laches* to bar a right asserted by defendant merely by way of defense").