(No. 53059.—

BRUCE H. DODDS *et al.*, Appellants, v. PETER GIA-CHINI, Appellee.

*Opinion filed March 18, 1981.*

MORAN and SIMON, JJ., took no part.

Sidney R. Zatz, Nathan M. Cohen, Roger G. Fein, and Malcolm S. Kamin, of Arvey, Hodes, Costello & Burman, of Chicago, for appellants.

William J. Harte, Ltd., of Chicago (William J. Harte, of counsel), for appellee.

MR. JUSTICE WARD delivered the opinion of the court:

The plaintiffs, Bruce H. Dodds and Douglas W. Dodds, filed a complaint in the circuit court of Cook County to "cancel" an agreement with the defendant, Peter D. Giachini, granting the latter an option to purchase stock from the plaintiffs. The defendant filed a counterclaim seeking specific performance of the agreement. After a trial without a jury, judgment was entered in favor of the plaintiffs on their complaint, and the counterclaim was dismissed. The appellate court reversed (79 Ill. App. 3d 358), and we allowed the plaintiffs' petition for leave to appeal under Rule 315 (73 Ill. 2d R. 315).

Disposition of the complaint and of the counterclaim turn on the same issues. An understanding of the latter requires an account of the circumstances leading to the execution of the agreement, dated May 7, 1976, and the conduct of the parties thereafter prior to the filing of the complaint on September 29, 1977. The case was tried on a stipulation that recitals of certain facts made therein were true, and that various pieces of correspondence between the parties which were admitted as exhibits were sent and received on the dates indicated by the persons shown as the senders and addressees. The defendant also testified on his own behalf, but his testimony did not figure in the decisions below. The stipulation does not represent that no communications, meetings, or conversations concerning

the agreement took place between the parties other than those included in the stipulation and the exhibits, and the exhibits themselves show that that is not the case, since several of them refer to other communications of which no evidence was introduced.

In 1970 Bruce H. Dodds and Douglas W. Dodds, his father, the plaintiffs, organized the Tollway Arlington National Bank, which was located in Arlington Heights, a suburb of Chicago. They controlled over 51% of the 3,000 shares of the bank's stock that was outstanding. The elder Dodds was then a director of six other banks, and had been engaged in the banking business since 1930. In 1974 the plaintiffs became the beneficial owners of a parcel of real estate in Arlington Heights, which was at that time improved with a partially completed office building.

In October 1975 the bank moved into the building, occupying the entire first floor and one-half of the basement. No formal lease was executed at that time, but the bank was occupying the premises at a monthly rental of $7,900, a figure which was calculated on the basis of a specified charge per square foot of space occupied.

At least as early as November 1975 the bank was having discussions with the regional administrator of national banks for the Chicago area, whose office is part of the Federal Bureau of the Comptroller of the Currency. Correspondence between the bank and the administrator shows that the latter was concerned that the rentals being paid were excessive in relation to the bank's income, and that this disproportion might lead to a net operating loss. When a lease was drawn for the bank, to become effective May 1, 1976, the monthly rental, at the administrator's suggestion, was reduced to $5,100.

In 1975 and 1976 the plaintiffs were engaged in completing the building. In the spring of 1976 they concluded that additional funds were required for this purpose, and they entered into negotiations with the defendant, who

was then the president of the Maywood-Proviso State Bank, which was located in Maywood, another Chicago suburb. The defendant had held this position for 24 years.

These negotiations culminated in a written agreement dated May 7, 1976, which is the subject of this action. The defendant was to lend the plaintiffs $450,000 for a period of eight months at 8 3/4% interest, payable monthly, and he was given an option, to be exercised in eight months, to purchase from the plaintiffs an amount of the bank's stock sufficient to give him majority control. These shares were to be held by the defendant in the meantime as collateral security for the loan. The plaintiffs further agreed to grant the bank a five-year lease of space in their building at $5,100 per month, with optional renewals for seven successive periods. The bank was not a party to the agreement. Since the construction of the agreement is in dispute, its pertinent provisions are set forth below:

"1. LOAN. Purchaser [the defendant] agrees to loan to Sellers [the plaintiffs] the sum of $450,000 for a period of 8 months at 8 3/4% interest. It is agreed by the parties that 1583 shares approximately, but not less than 51% of all outstanding shares will be placed with Purchaser as collateral security for said loan. It is agreed that interest will be payable each month with the exception that at maturity any interest then due shall be paid by Sellers together with the principal which then remains unpaid.

2. OPTION TO PURCHASE CONTROLLING INTEREST IN TOLLWAY ARLINGTON NATIONAL BANK. Sellers represent that they own or control 1583 shares representing approximately 53% of the outstanding stock of said Bank and hereby grant to Purchaser an unrestricted option to purchase such shares at $300 per share. The option shall be effective on this date and shall remain effective for a period of 8 months, from the date hereof and in the event that the option is not exercised, then the stock pledged as collateral will be returned to Sellers upon payment by Sellers of the then outstanding loan balance.

3. LEASE TO BANK. Bruce Dodds represents that he is the owner of the beneficial interest in the trust hold-

ing title to a building commonly known as the Tollway Arlington National Bank building located at the Tollway and Arlington Heights Road. Bruce Dodds also represents that the $450,000 being borrowed from Purchaser will be used as follows:

$250,000 will be paid to Harris
Trust and Savings Bank
$200,000 will be used to complete
the building.

Sellers agree to grant to the Bank a lease for a 5 year term with 7 options for renewal at a rental acceptable to the Comptroller of the Currency of the United States and also acceptable to Purchaser. Rental for the first 5 years is to be $5100 per month. The rental shall increase as the deposits increase. When deposits reach $20,000,000 the rent shall increase to $5723.00 per month. Thereafter with each $5,000,000 increase the rent shall increase $311.50.

\*\*\*

4. \*\*\*

\*\*\*

b. \*\*\* Delivery of the Bank shares to the Purchaser in accordance with this agreement will on exercise of the option vest title to 53% of the issued and oustanding shares of capital stock of the Bank in the Purchaser free and clear of all liens, encumbrances, claims of every kind. Purchaser agrees to purchase up to 100% of the shares if so desired by Sellers at the same price of $300 per share.

\* \* \*

5. \*\*\*

\*\*\*

c. Sellers agree to repurchase on exercise of the option any loans in default or any loans listed as substandard by the Comptroller of the Currency in its regular examination of the Bank.

\* \* \*

10. \*\*\*

\* \* \*

g. In the event of exercise of the option, PETER D. GIACHINI may use the note signed by BRUCE

DODDS and DOUGLAS DODDS as part of the purchase price."

On May 10 the plaintiffs executed their promissory note for $450,000, and delivered to the defendant 1,558 shares of bank stock to be held as collateral, slightly less than the number specified in the agreement, but over 51%, together with executed stock powers in blank. The stipulation recites that from May 10, 1976, until August 1977 the parties engaged in negotiations over the terms of the lease to the bank by way of telephone conversations, meetings, and correspondence. The earliest contact between the parties reflected in the stipulation and the exhibits, however, is a letter of October 12, 1976, in which the defendant asked the plaintiffs to approve a proposed lease with the bank which was sent to them with the letter.

The proposed lease contained provisions relating to subletting, alterations, and other matters which are customarily covered in a commercial lease, but had not been dealt with in the May 7 agreement. The initial five-year term of the lease was to begin November 1, 1976. The monthly rent was to be reduced from $5,100 to $4,000, a reduction which the defendant indicated in his transmittal letter had been suggested by the regional administrator of national banks previously referred to in this opinion. The provisions in the agreement for renewals and for increases in rent contingent upon increases in the bank's deposits were included in the lease. Neither the stipulation nor the exhibits show any response by the plaintiffs to the defendant's proposal.

On November 5 the defendant sent the plaintiffs a request for payment of the installments of interest due or to become due for the months of July through November, which aggregated $13,270. The defendant sent a second notice on November 29. The record does not show that the plaintiffs paid these sums or made any response to

these notices.

On December 7, according to the stipulation, the plaintiffs sent the defendant a proposed lease of their own, which differed in important respects from both the defendant's draft and the provisions of the agreement regarding the term of the lease and the amount of the rent to be paid. Although the stipulation states that the lease was accompanied by a transmittal letter, that letter does not appear among the exhibits which are included in the record. Subsequent letters from the defendant to the plaintiffs establish, however, that the defendant did receive the lease.

In the plaintiffs' proposed lease the term was to be for two years only and was to begin January 1, 1977. There were to be seven optional renewals, the first for a three-year period and the others for periods of five years each. Although a monthly rent of $4,000 was specified for the initial two-year term, the rent during each of the renewal periods was to be negotiated, with no provision for an escalation of rent conditioned upon an increase in the bank's deposits.

Although the stipulation does not refer to it, correspondence between the regional administrator and the bank included in the exhibits shows that the terms of a new lease from the plaintiffs to the bank had been the subject of discussion as early as May 10, 1976, when the administrator again advised the president of the bank of his concern with unduly high occupancy costs. On June 9 the administrator wrote the bank's board of directors commenting adversely on a draft of the plaintiffs' proposed lease, and requesting written assurances that the board would not "enter into any long-range arrangements which might, in fact, be to the detriment of the institution." He added, "I would consider executing this lease under burdensome conditions to be an unsafe and unsound banking practice which would warrant administrative action." The

bank supplied the requested assurances on July 13, and undertook that it would not enter into a lease without first discussing its terms with the administrator. On November 2, the president of the bank wrote the administrator to advise him that the proposed lease would be forwarded shortly and stated again that the bank would not sign the lease until the administrator had had an opportunity to review it. The exhibits show that the president of the bank kept the plaintiffs informed of his correspondence with the administrator.

Following his receipt of the plaintiffs' proposed lease the defendant, on December 9, sent a letter that the defendant asserts was an exercise of his option to purchase stock, which was to expire January 7, 1977. The letter was as follows:

"I wrote to you on October 10 and suggested that we get together on the lease for the Tollway Arlington National Bank without further delay.

After almost two months since my letter to you I received a proposed lease which varies from our agreement. However, I hereby serve notice of exercise of option to purchase the controlling shares in Tollway Arlington National Bank under the terms of the agreement dated May 7, 1976.

Under the terms of the agreement, you agreed to grant to Tollway Arlington National Bank a lease for a five year term with seven options for renewal at a rental acceptable to the Comptroller of the Currency and to me. Since that date you advised me that the Comptroller of the Currency stated that in his opinion the rental of $5100 per month was excessive and that $4000 per month would be a proper rental. I accept the suggestion and under the terms of our agreement it is my belief that in the first five years the lease should call for a rental of $4000 per month. The rental for the renewal periods should be arrived at by agreement between us or by arbitration.

In accordance with the agreement above dated, I agree to purchase up to 100% of the shares of stock in Tollway Arlington National Bank at a price of $300 per

share with a minimum of 51% of the outstanding shares. Please advise me as to how many shares you are prepared to deliver at closing. I will accept the shares now at Harris Trust & Savings Bank. Any other shares which you want me to purchase should be made available within the following 30 days. Any shares not offered within the 30 day period following will then be purchased by me and my associates at my option.

The agreement also provides: that the Bank's reserve for loan losses is to be adequate; that all doubtful loans are to be written off against the reserve for loan losses; that the loans in the Bank portfolio are current and collectible. I will expect the two of you to purchase all loans listed as "doubtful" or "loss". This will be a credit against my purchase price.

I am prepared to see you at your early convenience to work out any problems that exist or may arise in connection with the transfer of controlling interest in the Bank."

The agreed price for the 1,558 shares of stock at $300 per share was $467,400. Although the plaintiffs' promissory note did not fall due until January 10, 1977, the agreement provided that the defendant might use the note as part of the purchase price, and the stipulation states that the total indebtedness on the note as of December 10, 1976, including both the principal of $450,000 and the unpaid interest, would become either $466,647 or $466,407, depending on whether or not interest was compounded on past due installments. In order to consummate the purchase, therefore, the defendant would have had to tender the full price of the stock in cash or else tender the cancelled promissory note and enough cash to make up the difference. The defendant did not make this tender on December 9, nor did he do so at any subsequent point.

The defendant commented further on the plaintiffs' proposed lease in a letter to them of December 14. He stated that, although the lease differed from what was contained in the May 7 agreement, he was willing to compromise, and he listed those provisions of the lease which he found acceptable and those which he did not.

The plaintiffs did not respond to the defendant's letters of December 9 and December 14. January 7, 1977, was the last day for the exercise of the option, and, as just noted, January 10 was the date when the plaintiffs' note fell due. The defendant did not make a tender on the former date, and the plaintiffs did not repay their loan on the latter.

On January 27, however, the plaintiffs and the bank executed the lease of which the plaintiffs had sent the defendants a copy on December 7. It was stipulated that the defendant had not been advised and did not know that the lease was to be presented to the bank for execution on that date. The lease was to become effective January 1, 1977, and was to terminate December 31, 1978. A copy of the lease had been sent to the regional administrator a short time before its execution, and the lease was not executed until receipt of a letter from him advising that his office had no objection to it. The administrator also stated in his letter, however, that he did not deem it advisable to execute a lease for more than a two-year period until the impact of the present lease on the bank's future income could be assessed.

On February 24 the plaintiffs and the defendant effected a transfer into the defendant's name of 10 of the 1,558 shares of bank stock being held by him as collateral, and on the same date the defendant was elected to the bank's board of directors to fill a vacancy. No reason for the plaintiffs' placing the defendant on the board appears in either the stipulation or the exhibits.

There was subsequent correspondence between the parties, as appears from the exhibits, in which the defendant raised additional objections to the lease, including a complaint that the lease had reduced the amount of space occupied by the bank at the time when the May 7 agreement was executed. In letters of March 2 and March 9 the defendant stated that he was withdrawing the offer to

compromise that he had made on December 14, 1976. In these and in further letters the defendant adhered to the position that he had exercised his option; that he was prepared to "close" the transaction as soon as the plaintiffs had executed a lease with the bank which conformed to the May 7 agreement, and had performed various other actions which he claimed were required under that agreement; but that until those events came to pass he would continue to accrue interest on their loan. It may be inferred from the absence of any statement to the contrary in the stipulation that the plaintiffs made no payments on their indebtedness, did not modify the lease, and took no action to meet any of the defendant's other demands.

On September 20, 1977, the plaintiffs met with the defendant and tendered a cashier's check in the amount of $514,008 as payment of the amount due on their loan, including interest from May 10, 1976, to date, and requested the return of their cancelled note and the 1,548 shares of stock held as collateral. The defendant declined the tender, stating again that he had exercised his option to purchase the stock. On September 23, at the direction of the defendant, pursuant to the stock powers given him, the bank issued certificates to him for the 1,548 shares of stock. The plaintiffs filed their complaint on September 29, and the court issued a temporary injunction restraining the defendant from transferring the stock to his name pending a hearing on the merits.

In their complaint the plaintiffs asked that the defendant be required to return their promissory note as paid, as well as the 1,548 shares of stock, and that the court declare the agreement of May 7 to be of no further force or effect. The defendant's counterclaim sought an order requiring the plaintiffs to perform the agreement in its entirety and to transfer the optioned stock to the defendant. It was alleged that the defendant's remedy at law

was inadequate. The plaintiffs do not contest that allegation.

A judgment in favor of the plaintiffs would thus leave them in control of the bank, the defendant would receive the amount found owing to him under the note, the plaintiffs would be relieved of any obligation to grant a new lease to the bank, and the latter would continue to occupy space in the plaintiffs' building under the terms of the lease executed on January 27, 1977. A judgment for the defendant, on the other hand, would give him control of the bank, and would require the plaintiffs to grant a new lease conforming to the provisions of the agreement.

In rendering judgment for the plaintiffs on May 9, 1978, the circuit judge filed a memorandum opinion in which he articulated the reasons for reaching his decision. To begin with, the opinion stated, the letter of December 9 did not purport to be an exercise of the option but only a notice of its exercise. Secondly, there had been no effective exercise of the option, because the defendant had conditioned his purchase upon conditions not contained in the agreement, notably those relating to the lease, and because he did not tender the purchase price. Thirdly, the agreement's provisions with respect to the lease, particularly as to the amount of space to be occupied, were so indefinite as to make the entire agreement unenforceable. Finally, since the defendant had not made the bank a party to the suit when he filed his counterclaim, the bank would not be bound by the court's judgment and it might refuse to accept a new lease offered by the plaintiffs, thus making a decree of specific performance ineffectual.

In reversing the circuit court, the appellate court concluded that the December 9 letter both purported to and did exercise the option, and that the requirement of tender had been satisfied because the defendant, in the court's words, "had made numerous sincere efforts to fulfill his

duties under the agreement." (79 Ill. App. 3d 358, 363.) The appellate court agreed with the circuit court that the absence from the agreement of any specification of the space to be leased made the lease too indefinite to permit its enforcement by a decree of specific performance. The appellate court held, however, that a judgment granting specific performance of the remainder of the agreement would be proper, and it remanded the cause with directions to enter such a judgment. While the court did not specify what particular actions by the plaintiffs the judgment would require, the transfer of the 1,548 shares of stock to the defendant would presumably be among them.

Our own analysis of the evidence, which differs in some respects from that made by the appellate court, leads us to conclude that the defendant did not exercise his option within the period allowed by the agreement, and that the plaintiffs' promise to grant a lease to the bank was too indefinite to be enforceable. For these reasons we reverse the judgment of the appellate court.

We consider first whether the defendant's option lapsed after January 7, 1977, the last day upon which it could be exercised under the agreement of May 7, 1976. The exercise of the option would of course consist of the transfer of ownership of the shares to the defendant and the payment to the plaintiffs of the purchase price. The defendant already had possession of the shares and had been given blank stock powers, so that no further action on the part of the plaintiffs was required. All that remained to be done was for the defendant to pay the plaintiffs the full $467,400, or whatever lesser sum would be due if the defendant chose to apply to the purchase price the amount of the plaintiffs' indebtedness. The defendant concedes that no such transaction took place prior to the expiration of the option, but he urges that his letter of December 9, 1976, prevented the option from lapsing. We do not agree.

The trial judge attached some significance to the defendant's use of the words "I hereby serve notice of exercise of option to purchase," rather than "I hereby exercise the option to purchase." While that choice of words would not in itself negate an intention to exercise the option immediately (*Kadansky v. Fickett* (1973), 54 Ill. 2d 14, 15-16), the defendant's words, when read in the context of the entire letter, may have meant only that he planned to exercise his option despite the plaintiffs' deviation from the terms of the agreement, and would do so in the future once they should tell him how many additional shares, if any, they wished to sell. The plaintiffs did not state that they had additional shares to offer, however, and when the defendant failed to make or tender payment for the 1,558 shares of optioned stock by January 7, the option lapsed. We do not agree with the appellate court's view that the various actions taken by the defendant after January 7 to which the court refers could retroactively serve as a substitute for timely payment of the purchase price.

The plaintiffs also contend that the defendant's letter of December 9 did not constitute an exercise of the option because it was not an unconditional acceptance of the terms of the May 7 agreement (*Morris v. Goldthorp* (1945), 390 Ill. 186). Since we conclude that the option lapsed for the failure of the defendant to pay for the stock, the question whether he also conditioned his purchase upon new conditions might seem to require no consideration. Both the appellate court and the defendant, however, rely on events occurring after the letter of December 9 as showing that the parties treated the option as having been exercised, or that they at least implicitly waived the deadline for its exercise, and discussion of this issue is thus appropriate.

The plaintiffs first contend that the December 9 letter was not an unconditional exercise of the option because it specified a monthly rental of $4,000, whereas the agree-

ment called for one of $5,100. This contention overlooks that it was the plaintiffs themselves who first proposed the reduction to $4,000 in order to comply with the suggestion of the regional bank administrator. The defendant's letter merely registers his consent to this alteration of the agreement. The defendant's letter also states that upon renewal of the lease the amount of the rental should be negotiated, whereas the agreement specified a formula for escalation if the bank's deposits should increase. Here again, however, that alteration had already been proposed by the plaintiffs as the result of their conversations with the administrator.

Finally, the letter of December 9 states that the defendant expected the plaintiffs to purchase all loans listed as "doubtful" or "loss," and that "this will be a credit against my purchase price." The appellate court construed this statement as no more than a reminder to the plaintiffs of their contractual obligation "to repurchase any loans in default or any loans listed as substandard by the Comptroller of the Currency in its regular examination of the Bank." 79 Ill. App. 3d 358, 362.

If the letter of December 9 alone is considered, therefore, the claim that the defendant imposed conditions upon the exercise of the option is not warranted. On December 14, however, the defendant wrote the plaintiffs again concerning their proposed lease, and in this letter he stated that it should reinstate the provisions of the agreement as to the length of the initial lease and the number and duration of the successive renewals, which had been altered by the plaintiffs. He also asked for restoration of the original provision for rent escalation, which, as noted above, had been dropped from the plaintiffs' lease.

The plain implication of this letter is that, unless the defendant's objections to the lease were met, he would not purchase the optioned stock. That position was made

explicit in two letters written in March 1977 in which the defendant made the objection that the space allotted to the bank by the lease was less than what had been occupied at the time the agreement was made, and the same position was taken in subsequent letters with regard to other objections to the lease. The defendant, according to the plaintiffs' brief, "considered plaintiffs' acquiescence in his version of the lease a pre-condition to his obligation to purchase the shares." That position is diametrically opposed to the position which the defendant now takes in this litigation, where his brief states that "[t]he lease was to materialize only at some point after the exercise of the option."

Disagreement between the parties over whether negotiation of a lease acceptable to the defendant was a condition to the exercise of the option lies at the center of this litigation. The stipulated facts and exhibits do not disclose the economic considerations underlying the agreement, but it may be supposed that the offer of a stock option was a necessary inducement to the defendant to lend money to the plaintiffs. As a corollary the plaintiffs would have to provide the defendant with assurance that the bank could continue to occupy its present premises under a lease which he would deem acceptable, for while the defendant would have no concern with the terms of the lease unless he became the owner of the bank, he would surely take those terms into account in deciding whether or not to purchase the stock.

The parties may have anticipated that the eight months allowed in which to exercise the option would afford ample time in which to settle upon the terms of the lease, but in any event their agreement, which was drafted by the defendant, did not require that the lease be executed before or upon the exercise of the option. If, when that time arrived, no lease acceptable to the defendant had been drawn, he would be fully protected, since he could simply

decline to purchase the stock.

The defendant offers a different analysis of the transaction. In his verified answer to the complaint he states that he had viewed the location of the bank as undesirable, and that the bank should move, and within a few years probably would move, to other premises. He contends that the plaintiffs did not enter into good-faith negotiations over the lease, and on oral argument his counsel charged that the plaintiffs never intended to go through with the sale of the stock but delayed the closing in order to enjoy the use of the funds that the defendant had lent them.

The picture of the dealings between the parties which emerges from the evidence does contain elements that may raise a question as to the plaintiffs' motives: their long delay in drawing up the draft of a lease and in submitting it to the defendant, their failure to keep him fully advised of the critical discussions with the regional bank administrator, the failure to make payments on their loan, and their agreement to place the defendant on the bank's board of directors. The communications between the parties on which the parties chose to try the case, however, are not and do not purport to be a complete chronicle of the transaction. From the fitful glimpses of events which the exhibits afford, we cannot discern, nor could the trial court, any evidence that the plaintiffs misled the defendant.

The next question raised by the plaintiffs' appeal is whether the agreement of May 7 was susceptible of enforcement by a decree for specific performance. Both the appellate court and the circuit court concluded that the plaintiffs' obligation to grant a lease to the bank was unenforceable because the agreement did not define the space to be covered by the lease, either by location or by amount of square footage. Although neither the agreement nor the stipulation so states, the defendant contends

that the parties must have intended that the bank be allowed the same space as that which it occupied when the agreement was negotiated. The difficulty with this theory is that none of the exhibits specifies what that space was, and that while the negotiations were going on the possibility of reducing the existing space was itself the subject of discussions between the plaintiffs and the regional administrator as a possible means of reducing the amount of the rent.

While the specificity required of a contract to make a lease may be less than that required of the lease itself, we agree that the present agreement was too vague to be enforceable by specific performance. The appellate court concluded that the plaintiffs' obligation to grant a lease could nevertheless be severed from the rest of the agreement, and that specific performance should be directed of their commitment to transfer the bank stock. The defendant, although stating that he has no objection to a decree thus limited, also maintains that the appellate court erred in failing to require specific performance of the lease, and we turn initially to that claim.

In addition to the obstacle already discussed regarding the space to be leased, a further difficulty arises as to what the rent should be. The lease to the bank executed on January 27, 1977, terminated on December 31, 1978, and the appellate court filed its opinion in this case on November 30, 1979. Under the terms of the lease the bank had an option to renew it for a three-year period ending December 31, 1981. The record does not disclose whether the bank did renew or, if it did renew, at what rent. Under the lease the amount of rent was to be negotiated. Under the agreement of May 7 the rent was made subject to an escalation clause and also to the approval of the regional bank administrator. The passage of time has made obsolete the prescriptions of the 1976 agreement on which this action is founded, and the record is barren of facts from which a

substitute for the promised performance could be fashioned.

In holding that the plaintiffs should be required to transfer the shares of stock the appellate court relied on the rule that one who has contracted to sell land but is unable to convey the entire property may be ordered to convey whatever interest he has, with an abatement of the purchase price. (See, *e.g., Laegeler v. Bartlett* (1957), 10 Ill. 2d 478, 483.) The plaintiffs question the applicability of that rule to the present case, where the agreement calls for the performance of two different but related acts. It is unnecessary to decide that question, however, for the defendant's claim to the stock derives only from the option, which, we have held, was never exercised.

For the reasons given in this opinion, the appellate court's decision that the defendant was entitled to relief was in error. As the parties concede, the same reasons require that the relief sought by the plaintiffs' complaint be granted. The judgment of the appellate court is accordingly reversed, and the judgment of the circuit court of Cook County is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*

MORAN and SIMON, JJ., took no part in the consideration or decision of this case.