# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**Wendy & William Spatz Charitable Foundation v. 2263 North Lincoln Corp.,**
**2013 IL App (1st) 122076**

---

| | |
|---|---|
| Appellate Court Caption | WENDY AND WILLIAM SPATZ CHARITABLE FOUNDATION, Plaintiff-Appellee and Cross-Appellant, v. 2263 NORTH LINCOLN CORPORATION, BOBBY BURLESON and KEVIN KILLERMAN, Defendants-Appellants and Cross-Appellees. |
| District & No. | First District, Fifth Division<br>Docket No. 1-12-2076 |
| Rule 23 Order filed<br>Rule 23 Order withdrawn<br>Opinion filed | September 6, 2013<br><br>October 7, 2013<br>October 11, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a forcible entry and detainer action, the trial court properly entered a judgment granting possession to plaintiff, an entity which purchased the property shortly before defendants' lease expired, notwithstanding defendants' contention that they had exercised their option to purchase the property from the prior owner and could not be evicted, since the record did not support defendants' claim, but the cause was remanded for further proceedings on plaintiff's petition for attorney fees. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-M1-715937; the Hon. Sheldon Garber, Judge, presiding. |
| Judgment | Affirmed in part and remanded in part. |

| Counsel on Appeal | Michael Pomerantz, Andrew Jacobson, Josh Goldberg, and Stephanie Grelewicz, all of Brown, Udell, Pomerantz & Delrahim, Ltd., of Chicago, for appellants. |
|---|---|
| | Alisa Levin, of Law Office of Alisa Levin, of Chicago, for appellee. |

| Panel | JUSTICE TAYLOR delivered the judgment of the court, with opinion. Justices McBride and Howse concurred in the judgment and opinion. |
|---|---|

**OPINION**

¶ 1    Defendants 2263 North Lincoln Corporation (Lincoln), Bobby Burleson and Kevin Killerman appeal from a judgment of the circuit court of Cook County in a forcible entry and detainer action, granting possession of real property with the common address of 2257-2263 North Lincoln Avenue, Chicago, Illinois (the property), in favor of plaintiff the Wendy and William Spatz Charitable Foundation (Spatz), which had acquired that property before defendants' lease expired. Defendants contend that the court erred in awarding possession to Spatz because before Spatz acquired the property, Lincoln had exercised its option to purchase the property from its prior owner, Victory Gardens Theater (VGT), and therefore, could not be evicted. On cross-appeal from the order, plaintiff contends that while the trial court properly awarded attorney fees to Spatz pursuant to the lease with defendants, it improperly reduced the amount of fees. Plaintiff further contends that the trial court erred in denying its holdover claim against defendant, in which plaintiff sought double rent for the time defendants occupied the property after the lease expired.

¶ 2                     BACKGROUND

¶ 3    The dispute in this case arose from an action of forcible entry and detainer filed by Spatz, the current owner of the property, against Lincoln, a tenant pursuant to a lease that expired by its own terms on May 31, 2009. On July 6, 2009, plaintiff filed its action against Lincoln and its principals, Burleson and Killerman, who were also guarantors under the lease. In that complaint, Spatz sought possession of the property as well as rent and damages for defendants' allegedly unlawful withholding of the premises since June 20, 2009.

¶ 4    Spatz subsequently filed its first amended complaint, in which it explained that the property is a mixed-use restaurant and theater building, and that defendants occupied a 3,300-square-foot portion of that property utilized as a bar or restaurant. Plaintiff further stated that defendants occupied the property pursuant to a lease entered into in 1994 with

plaintiff's predecessors in interest, VGT and Community Arts Foundation (CAF), which later transferred its interest to VGT. Spatz acknowledged that the lease provided that VGT would offer to sell the property to Lincoln first before "generally" offering it for sale. Plaintiff alleged, however, that although the property was never offered for sale "generally," VGT nevertheless made a written offer to sell it to Lincoln before selling it to Spatz. According to plaintiff, while Lincoln responded that it intended to purchase the property, it did not take any further steps to consummate the purchase and did not tender a contract to VGT and, consequently, no closing ever took place. Since no sale was closed between VGT and Lincoln within 90 days after the offer was extended to Lincoln, VGT was then permitted to sell the property to another party under the terms of the lease, and at that time, VGT sold the property to Spatz, which took over ownership of the property in August 2008. Plaintiff further alleged that since Lincoln never renewed its lease, it sent Lincoln a 30-day notice on May 19, 2009, notifying Lincoln that its lease was to expire on May 31, 2009. Despite the notice, Lincoln failed to vacate the property upon the expiration of the lease or within 30 days of receipt of the notice. Based on those allegations, plaintiff sought, in count I of the complaint, possession of the property, as well as rent and damages from defendants for Lincoln's unlawful withholding of possession of said property. In count II, plaintiff sought holdover tenancy, pursuant to section 9-202 of the Illinois Code of Civil Procedure (Code) (735 ILCS 5/9-202 (West 2008)), which allows a landlord to recover double the yearly rent from a tenant who willfully holds over the property after the expiration of the lease and after the landlord sends written notice to such tenant.

¶ 5 Attached to plaintiff's first amended complaint was a copy of the lease agreement, which provided, in paragraph 28:

"Prior to offering the Property for sale generally, [VGT] will offer to sell the Property to [Lincoln] by written notice to [Lincoln] (the Offer Notice). The Offer Notice shall specify an all cash purchase price [VGT] is prepared to accept for the Property (the Offered Price), in 'as is' condition. [Lincoln] shall have ninety (90) days following receipt of the Offer Notice to elect, by written notice to [VGT], either (i) to purchase the Property at the Offered Price, or (ii) to permit [VGT] to sell the Property and thereafter have the option to terminate this [l]lease ***. If [Lincoln] fails to timely notify [VGT] of its election [to purchase], [Lincoln] shall be conclusively deemed to have elected to permit [VGT] to sell the Property ***.

If [Lincoln] elects to purchase the Property at the Offered Price ***, then (i) [Lincoln] shall purchase the Property in 'as is' condition, [and] (ii) a closing of the purchase and sale shall occur ninety (90) days after [Lincoln] elects to purchase."

¶ 6 We note that while the parties throughout the proceedings refer to the provisions under paragraph 28 as a "purchase option," "right of first refusal," and "right of first offer," they do not appear to dispute that once that right was triggered, the landlord was obligated to inform the tenant of its intention to sell the property at a certain price and the tenant would then have the opportunity to purchase it at that price.

¶ 7 Also attached to the complaint was plaintiff's 30-day notice to Lincoln, which stated that its tenancy at the property would be terminated on May 31, 2009, or after 30 days of service

of the notice, at which time Lincoln was to vacate the premises. As alleged in the complaint, the notice was issued on May 19, 2009.

¶ 8     Defendants filed an answer, which also contained affirmative defenses, counterclaims and a third-party complaint against VGT, and Wendy and William Spatz. In their answer, defendants admit that VGT sent them a letter offering to sell Lincoln the property pursuant to paragraph 28 of the lease, but, contrary to plaintiff's allegation, defendants contend that they did, in fact, accept VGT's offer to purchase the property in "as is" condition. According to defendants, they had no obligation to tender a contract for purchase to plaintiff or VGT, and no closing took place only because VGT refused to consummate the sale of the property after Lincoln accepted its offer. Furthermore, defendants admitted that they did not vacate the property after receiving Spatz's notice to vacate, nor did they renew their lease, but explained that since they had exercised the option to purchase the property, such renewal was not necessary.

¶ 9     Defendants further alleged that VGT, acting in concert with plaintiff, refused to honor Lincoln's acceptance of VGT's offer, even though, according to defendants, the lease required VGT to offer the property to Lincoln for purchase before offering it for sale to any third party. They explained that plaintiff is an entity established and controlled by Wendy and William Spatz, who are VGT's board members, and in an attempt to evade Lincoln's right of first refusal, VGT and Spatz agreed on several restrictions of use of the property that benefit VGT as part of the purchase contract, and included those same restrictions in the offer that VGT made to Lincoln. According to defendants, while no such restrictions previously existed, VGT's offer to sell the property to Lincoln included the conditions that: (1) the portion of the property operated as a theater under the name Victory Gardens Greenhouse be permitted to continue to operate in such manner for a period of time; (2) VGT be granted use of office space on the property at no charge for a period of six months; and (3) Lincoln grant VGT a right of first refusal for any subsequent sale of the theater space. Defendants asserted that since the lease gave Lincoln an option to purchase the property for an all cash price in "as is" condition, VGT was required to offer to sell the property to Lincoln with no such restrictions. Thus, defendants claim that when Lincoln accepted VGT's offer to purchase the property for $2,250,000 but refused the restrictions imposed, VGT had the obligation to close on the sale and convey the property to Lincoln, which it did not do. Plaintiff and VGT subsequently recorded a "memorandum of declaration," which restricts the use of the property in accordance to the restrictions to which plaintiff agreed when it contracted to purchase the property. According to defendants, encumbering the property in that manner was an effort by VGT and plaintiff to frustrate Lincoln's purchase option under the lease.

¶ 10    Based on those allegations, defendants assert two affirmative defenses to plaintiff's complaint, namely, breach of contract and breach of good faith and fair dealing by VGT when it failed to offer to sell the property to Lincoln without new restrictions and subsequently refused to honor Lincoln's election to purchase the property for the price offered. Since Spatz was VGT's purported successor in interest, defendants further asserted that plaintiff assumed all rights and obligations under the lease and was subject to the same claims and defenses as defendants may have against VGT for failing to perform its

-4-

obligations under the lease. Defendants' counterclaims and third-party complaint included: (1) breach of contract; (2) specific performance, in which it sought ownership of the property; (3) tortious interference with a contract; (4) tortious interference with prospective economic advantage; (5) commercial disparagement; (6) fraudulent transfer and quiet title; and (7) unjust enrichment.

¶ 11    Attached to defendants' answer, counterclaims and third-party complaint was, *inter alia*, a letter from VGT to Lincoln, dated April 22, 2008, which stated that VGT had entered into an agreement to sell the property to Spatz, but before doing so, VGT was thereby offering to sell it to Lincoln for the same price and under the same terms and conditions as set forth in the agreement. The letter further stated that Lincoln had 90 days from receipt of that letter to make an election to purchase the property under those terms. The sales agreement between VGT and Spatz was enclosed and provided, as noted in defendants' answer, that the purchase price was $2,250,000, that the theater space of the property would be used primarily as a theater for a period of 25 years, that VGT would have the right of first refusal should the purchaser sell the theater space, and that VGT would have the right to use the office area in the theater space free of charge for 6 months. Also attached to defendants' answer was a copy of their letter, dated May 1, 2008, in response to VGT's offer letter. In their response, defendants presumed that CAF was still one of the owners of the property, and stated that "[i]f both Landlords are offering to sell the Property to Tenant in 'as is' condition for a purchase price of $2,250,000, then Tenant is willing to purchase the Property in 'as is' condition for the purchase price of $2,250,000 upon such terms and conditions as are mutually acceptable to Landlords and Tenant." Defendants then "request[ed] a meeting" with the property owners to discuss the terms and conditions that may be acceptable to both parties with respect to the purchase of the property by Lincoln.

¶ 12    On the first day of trial, the court granted defendants' motion for voluntary nonsuit of their counterclaim and third-party complaint, thereby dismissing VGT, as well as Wendy and William Spatz individually. Spatz's first witness was Burleson, the president of Lincoln, who testified that in his experience in the restaurant business, purchasing property "as is" means that "[t]he seller gives you the keys and walks out." Burleson further acknowledged that he received the notice to vacate from Spatz, but had not yet vacated it as required. He stated that when he received the offer letter from VGT and saw the terms of the contract between VGT and Spatz, he believed that he was not obligated to abide to all the restrictions under the contract because Lincoln had the right of first refusal under the lease. Burleson acknowledged that he never deposited any earnest money to VGT, did not receive a bank's letter of commitment to finance the purchase, and did not provide it with a real estate contract. Instead, he only directed his attorney to tell VGT what Lincoln's position was with regard to their offer. When asked if he took steps to purchase the property upon receipt of the letter, Burleson responded that he took steps to "clarify it," but did not close on the property.

¶ 13    On examination by Lincoln's counsel, Burleson testified that when he met with VGT's counsel, Jeffrey Rappin, to discuss his right of first refusal under the lease agreement, nobody explained to him the meaning of taking the property in "as is" condition. However, Burleson averred that when he entered into the lease, he understood that the right of first refusal would allow him to purchase the property to use as he saw fit, and he would not have agreed to

those restrictions as a condition to exercise that right. With regard to the offer letter from VGT, Burleson explained that when he saw the contract between VGT and Spatz, he believed that those parties had worked out a deal, and that VGT added the restrictions "just to start negotiations" with Lincoln. Thus, when Lincoln's counsel replied to VGT's offer letter, Burleson's understanding was that he informed VGT that Lincoln was willing to purchase the property for the offered price of $2,250,000 without the restrictions and that Lincoln wanted to meet with VGT to discuss the purchase. Burleson further stated that a meeting later took place between himself, VGT and their respective attorneys, where Rappin stated that VGT would not sell the property without those restrictions and that it intended to close on the contract with Spatz. After that meeting, Burleson made sure that Lincoln would be able to finance the purchase and directed his counsel to continue negotiations with VGT, such that his counsel proceeded to make phone calls to discuss the sale. Burleson acknowledged that under the lease, he had 90 days from the receipt of an offer to close on the purchase, but averred that his lawyers tried to do that within that period. Lincoln never tendered any payments to buy the property because VGT did not agree to sell it without the restrictions, which Burleson considered a breach of the right of first refusal. After Spatz closed on the property, William Spatz contacted Burleson to tell him that he wanted Lincoln to vacate the property, and Burleson responded that he believed that the sale to Spatz was invalid and that Lincoln was the rightful owner. Burleson further testified that he continued to make rent payments after the expiration of the lease in May 2009 pursuant to an agreed court order between the parties, but explained that some of the checks were sent back.

¶ 14    On redirect examination by plaintiff's counsel, Burleson acknowledged that Lincoln and its lawyers did not file a lawsuit to enforce its right of first refusal after they learned of the contract between VGT and Spatz. He explained that they took no legal action because they were "surprised" by it, were "trying to get an understanding of what was going on," and were "left out of the negotiations." Burleson further stated that he did not believe that VGT's offer letter actually extended him an opportunity to purchase the property under the terms of the attached contract because he "could see that [VGT and Spatz] had a scheme going on." He admitted that the only legal action that he took was filing an affidavit of interest on the property on November 26, 2008, well after Spatz closed on the purchase. Furthermore, he acknowledged that on August 25, 2008, William Spatz offered to sell to Lincoln only the portion of the property occupied by the restaurant for $1,800,000.

¶ 15    Plaintiff next called Rappin, who had been a board member of VGT at all times relevant to the dispute, and who, as noted above, represented VGT in connection with the sale to Spatz. Rappin testified that the property was never submitted to a real estate broker for consideration for placement on a multiple-listing service, advertised for sale, placed on the market for sale generally, or even offered it to anyone. Instead, the board only voted to accept the offer made by Wendy Spatz after the property was appraised. According to Rappin's understanding of VGT's obligations under the lease, VGT was not obligated to offer to sell the property to Lincoln, and only did so because Spatz requested it.

¶ 16    Rappin further testified that when he received Lincoln's letter in response to VGT's offer, he understood it as a counteroffer because it did not comply with the terms set forth in VGT's letter from April 22, 2008. He assumed that the ultimate intent of the letter was to

request a meeting with VGT and its counsel to discuss terms and conditions under which the parties may reach an agreement. Rappin further stated that Lincoln never tendered any earnest money to VGT as would have been required to satisfy the conditions of the offer to purchase the property. Moreover, Rappin testified that the property was offered to Lincoln on an "as is" basis, which, in his opinion, means that it was offered with whatever title exceptions existed at that time.

¶ 17 Plaintiff subsequently called William Spatz, who testified that the Spatz foundation became the sole owner of the property in question around August 1, 2008. According to William, he did not believe that VGT was obligated to offer to sell the property to Lincoln because it was never offered to the public generally. He nevertheless instructed Rappin to send Lincoln the offer letter because if Lincoln was willing to purchase the property on the same terms as Spatz was ready to purchase it, Spatz would not have objected to it. William stated that when he asked Burleson and his attorneys whether they were interested in renewing Lincoln's lease of the bar space, he did not receive a response. He further explained that the purpose of delivering the 30-day notice to vacate was to notify Lincoln that the lease was about to expire on May 31, 2009, and Spatz was thereby demanding that Lincoln vacate the premises at that time. According to William, Lincoln did not leave, but continued to pay rent after the lease expired.

¶ 18 On cross-examination, William admitted that he told Rappin, in an e-mail dated May 6, 2008, that he intended to close on the purchase of the property regardless of Burleson's position, but later explained that he understood that Burleson's position, as expressed in his response letter, was not an acceptance of the offer. With regard to the notice to vacate, he explained that the reason the notice gave Lincoln until May 31, 2009, or 30 days after May 19, 2009, was for Spatz to "cover" itself in case it was required to give the tenant 30 days to vacate. In addition, he acknowledged that, before the lease expired, he offered to sell the bar portion of the property to Lincoln for $1,800,000, after purchasing the entire property for $2,250,000. William further admitted that while Lincoln made rent payments after the property was sold to Spatz, those checks were made to VGT, which then forwarded the payments to Spatz. He also acknowledged that Lincoln had filed an affidavit of interest in which it disputed the sale to Spatz and claimed that it had exercised its right of first refusal for the purchase of the property.

¶ 19 After the plaintiff rested, defendants called Gary Saipe, Lincoln's counsel at the time it received the offer letter from VGT. Saipe testified that the letter was an indication that Lincoln's right of first offer had been triggered because the letter stated that it was being delivered pursuant to paragraph 28 of the lease. According to Saipe, he worked to consummate the acceptance of VGT's offer without the additional restrictions for about four months, but was "put off" and prevented from closing. In Saipes' 37 years of experience as a real estate attorney, he believed that the term "as is" relates not only to the physical condition of the property, but also to the status of its title. Thus, Saipes believed that VGT's offer was not to sell the property "as is" because of the restrictions it contained. Saipes explained that in his response letter to VGT, he was conveying his election to purchase the property for the offered price of $2,250,000, but not subject to the restrictions. According to Saipes, Illinois law provides that when a tenant has a right to first offer or first refusal in a

lease, that tenant can accept an offer to purchase at the same time as it rejects the provisions that are not in accordance with the terms of the lease.

¶ 20    On March 7, 2012, the trial court entered its order, in which it awarded possession of the property to Spatz, and declined to address plaintiff's holdover claims. In its written order, the court found that plaintiff is the current owner of the property, but "that status could change." It noted that under its lease with VGT, Lincoln had an option to have the right of first offer to purchase the property, but that "Lincoln dragged its feet in exercise of that option." The court then stated that "[i]t is very difficult for the [c]ourt to determine the status of the [d]efendant, Lincoln. That are no longer a [l]essee pursuant to the terms of the lease which has expired, they may be a holdover tenant or a tenant at sufferance. I think what they are is a 'vendee in possession' ***." The court then ordered:

¶ 21    "In this case there will be a finding for the landlord [Spatz] an order of possession will be entered, stayed 90 days, with the caveat that Lincoln continues to pay use and occupancy. In the event Lincoln has purchased and consummated the deal pursuant to the term of the 1994 lease, that is for $2,250,000 in cash, in as is condition, and subject to restriction [*sic*] only that existed in 1994 then the [c]ourt will vacate the order of possession and dismiss the suit."

¶ 22    On June 11, 2012, the trial court ruled on plaintiff's petition for attorney fees pursuant to paragraph 14(f) of the lease, which provided that Lincoln "shall pay all [l]andlord's costs, charges and expenses, including the fees of counsel *** incurred in enforcing [Lincoln's] obligations hereunder." In its petition, plaintiff sought $91,554.40 in fees, and attached a summary of the amounts incurred by its counsel throughout the proceedings, as well as her invoices itemizing those costs. Defendants responded that a large portion of the fees sought by plaintiff were incurred for work entirely unrelated to plaintiff's enforcement of the lease, and listed numerous items of plaintiff's counsel's invoice which described work performed for parties other than Spatz, such as VGT, or William and Wendy, or are vague descriptions of the work performed. The fees challenged by defendants were a total of $35,979.22. The trial court awarded plaintiff's attorney fees, but reduced the amount to $50,000 while noting that plaintiff's counsel's hourly fees are reasonable, but without providing its rationale for the fee reduction.

¶ 23    On July 23, 2011, defendants filed a motion for directed finding, in which they argued that the notice to vacate that they received from Spatz was invalid and could not support an order of possession in Spatz's favor. They also claimed that Spatz's demand for, and acceptance of rent and utility payments created a new tenancy between Spatz and Lincoln. The trial court declined to adopt Lincoln's argument and entered an order of possession in Spatz's favor on March 12, 2012. Notably, paragraph 25 of the lease, which was admitted into evidence, states:

>    "No receipt of money by Landlord from Tenant after the termination of this Lease, the service of any notice, the commencement of any suit or final judgment for possession shall reinstate, continue or extend the Term of affect such notice, demand, suit or judgment."

¶ 25　　　On appeal from the trial court's judgment, defendants contend that the court erred in awarding possession of the property to Spatz because, as the court itself noted, Lincoln was a vendee in possession. Defendants maintain that the evidence presented at trial showed that it validly accepted VGT's offer to purchase the property for the offered price. They maintain that while Lincoln rejected the additional restrictions in VGT's offer, paragraph 28 of the lease gave them the option of purchasing the property for an all cash price in "as is condition," which according to Lincoln, relates not only to the physical condition of the property, but to any restrictions on its title as well.

¶ 26　　　Plaintiff responds that the trial court's statement that Lincoln was a "vendee" is non-binding *dictum*, since ordering possession in plaintiff's favor would be inconsistent with such a finding. It further argues that the trial court was correct in entering such an order because Lincoln failed to exercise its right of first offer when it responded to VGT's offer letter. According to plaintiff, the term "as is" refers only to the physical condition of the property, and when Lincoln responded that it would only agree to purchase the property without the restrictions outlined in the contract, that amounted to a counteroffer, which is not an acceptance. Moreover, plaintiff contends that, even if Lincoln's response amounted to acceptance, it abandoned the contract by failing to take any steps to close within 90 days as required under the lease. Plaintiff further argues that, in any event, the court was required to disregard most of Lincoln's allegations against VGT because they related to actions of a nonparty to the case.

¶ 27　　　In determining whether the trial court erred in entering a judgment in favor of plaintiff in an action brought under the Forcible Entry and Detainer Act (735 ILCS 5/9-101 *et seq.* (West 2008)), the standard of review is whether the ruling was against the manifest weight of the evidence. *S&D Service, Inc. v. 915-925 W. Schubert Condominium Ass'n*, 132 Ill. App. 3d 1019, 1021 (1985). For a finding to be against the manifest weight of the evidence, it must appear from the record that the " 'opposite conclusion is clearly evident' " or the findings of fact are " 'unreasonable, arbitrary and not based upon any of the evidence.' " *Maple v. Gustafson*, 151 Ill. 2d 445, 454 (1992) (quoting *Villa v. Crown Cork & Seal Co.*, 202 Ill. App. 3d 1082, 1089 (1990)). The role of a reviewing court is not to re-interpret the evidence, but only to determine whether the evidence on the record supports the lower court's judgment. *Midstate Siding & Window Co. v. Rogers*, 204 Ill. 2d 314, 319 (2003).

¶ 28　　　It is well established, and the parties do not dispute, that the only matter to be resolved in an action for forcible entry and detainer is the right of possession. *S&D Service*, 132 Ill. App. 3d at 1021. Furthermore, this court has repeatedly recognized that when a lease contains an option to purchase and such an option is accepted and exercised according to its terms, it becomes a present contract for the sale of the property and the lease agreement extinguishes, thereby transforming the partes' relationship from lessor-lessee to vendor-vendee. *Wolfram Partnership, Ltd. v. LaSalle National Bank*, 328 Ill. App. 3d 207, 216-17 (2001). Once a lessee becomes a vendee, it then enjoys a complete defense to an action for eviction. See, *e.g.*, *Bakaitis v. Fink*, 340 Ill. 440, 444 (1930). However, the lessee must exercise the option in strict conformity with all the conditions prescribed by the lessor, and the failure by the lessee to comply with those conditions renders any attempt to exercise the

option ineffective in creating a binding sale contract. *Wolfram*, 328 Ill. App. 3d at 217. In such a case, the lease and the parties' relationship as lessor-lessee continue. *Id.* In contrast, if the lessee properly exercises the option, the lessor loses any rights that it may have had under the lease. *Id.*

¶ 29    Defendants rely on *Vincent v. Doebert*, 183 Ill. App. 3d 1081, 1088 (1989), *Foster Enterprises, Inc. v. Germania Federal Savings & Loan Ass'n*, 97 Ill. App. 3d 22, 30-31 (1981), and *Scheidecker v. Westgate*, 164 Ill. App. 389, 394 (1911), for the proposition that when a lessor makes an offer to a lessee pursuant to the latter's right of first offer, but the offer does not comply with the terms of the lease, the lessee may effectively exercise its option by accepting the offer as it should have been made. See, *e.g.*, *Vincent*, 183 Ill. App. 3d at 1088-89 (where lease gave the lessee the right to purchase the property on the same terms as offered to a third party, but lessor's offer to lessee contained a guarantee requirement that was not present in the offer made to the third-party purchaser, the lessee effectively exercised the option by agreeing to purchase the property at the price offered to the third party while rejecting the additional requirement). However, even assuming, *arguendo*, that Lincoln could have exercised its option by agreeing to purchase the property for $2,250,000 without the additional restrictions, it would still have to comply with the terms of the lease insofar as it described the manner in which Lincoln must exercise its option. See, *e.g.*, *Northwest Racing Ass'n v. Hunt*, 20 Ill. App. 2d 393, 399 (1959) ("When the lessee is given the first privilege of purchasing the premises, he must, after notice from the lessor of the receipt of a bona fide offer, elect to exercise his privilege in accordance with the terms of the lease or the right is lost." (Internal quotation marks omitted.)).

¶ 30    Turning to the issue of whether Lincoln effectively exercised its option pursuant to paragraph 28 of the lease, our supreme court's opinion in *Dodds v. Giachini*, 84 Ill. 2d 284, 295 (1981), is instructive. In that case, an agreement between the president of a bank, who loaned funds to the majority holder of the bank's stocks, gave the lender the option to purchase shares of stock from the borrower, but placed an expiration date on the right to exercise that option. *Dodds*, 84 Ill. 2d at 287. Prior to the expiration of the option, the lender sent a letter to the borrower stating that it " 'serve[d] notice of exercise of option to purchase,' " in which he also noted that the borrower had breached certain terms of the agreement, and stated that if the borrower was interested in selling more shares than specified in the option, he would purchase those as well. *Id.* at 291-92. However, the borrower did not respond to that letter, and when the option expired, the lender had not tendered any payments for the shares that he could have bought under the option. *Id.* at 293. In ruling that the lender had not effectively exercised his option, our supreme court found that the lender's words in his letter, when viewed in context, may have meant that he planned to exercise his option despite the borrower's breach of the lease, and would do so in the future, when the borrower decided how many additional shares he was willing to sell, if any. *Id.* at 295. The supreme court then found that when the lender failed to tender payment for the optioned shares of stock by the expiration date, the option lapsed. *Id.*

¶ 31    In this case, as noted above, Lincoln's response to VGT's offer letter stated that Lincoln was "willing" to purchase the property for the offered price in "as is" condition upon terms and conditions acceptable to both parties, and requested a meeting to discuss such terms and

conditions. Paragraph 28 of the lease specified that a closing must occur within 90 days after Lincoln chooses to accept the offer, and there is no dispute that no such closing took place or that defendants never tendered payment for the property or any earnest money at any time. While Burleson testified that his lawyers tried to close within those 90 days, and that the reason for not tendering payments was that VGT would not agree to sell the property without the restrictions, he also stated that he did not take further steps to protect his interest because he "couldn't believe" there was already a contract between VGT and Spatz and he was "trying to get an understanding of what was going on." Thus, we conclude that the trial court did not err in granting plaintiff possession of the property.

¶ 32    While the trial court stated in its written order that it "thought" Lincoln was a vendee in possession, it did so after noting that Lincoln may be a tenant at sufferance or holdover tenant. In any event, those statements do not affect our conclusion as we can affirm the trial court's ruling on any basis found in the record. See *Studt v. Sherman Health Systems*, 2011 IL 108182, ¶ 48 (noting that "an appellate court may affirm a trial court's judgment on any grounds which the record supports [citation]"). Having reached such conclusion, we need not address whether the restrictions in VGT's offer letter to Lincoln are a breach of VGT's agreement to offer to sell the property in "as is" condition. See *Dodds*, 84 Ill. 2d at 297.

¶ 33    Defendants next contend, however, that even if Lincoln had not exercised its right of first offer, the trial court still erred in ordering possession to plaintiff because plaintiff's notice of eviction was invalid. They maintain that while the notice demanded that Lincoln vacate the property when the lease expired on May 31, 2009, or within 30 days of May 19, 2009, Spatz was required to give Lincoln until the last day of June. According to defendants, even if Spatz was not initially obligated to serve Lincoln with an eviction notice before the lease expired, once it chose to do so, it was required to do so in conformance with Illinois law. Defendants further argue that Spatz extended the lease and created a month-to-month tenancy by accepting rent after the expiration of the lease, and by allowing Lincoln to remain on the premises until June 19, 2009, after the lease expired.

¶ 34    In support of their contentions, defendants rely on section 9-207 of the Code, which requires landlords to send tenants a 30-day notice to terminate a tenancy of less than one year. 735 ILCS 5/9-207 (West 2008). They also rely on *Hoefler v. Erickson*, 331 Ill. App. 577, 583 (1947), which found that "a tenancy from month to month expires at midnight on the last day of the month" following service of the 30-day notice.

¶ 35    We first note, however, that neither section 9-207 of the Code nor the finding in *Hoefler* is controlling because the lease in this case was for a set term of 15 years. Furthermore, while the notice to vacate was sent to Lincoln on May 19, 2009 and reminded Lincoln that the lease was about to expire on May 31, the notice still gave Lincoln 30 days to vacate the property, thus complying with section 9-207 of the Code. Moreover, while the notice gave Lincoln two alternative dates to vacate the property, it is settled:

   " 'In the absence of controlling provisions in the lease *** if the date stated in the notice for termination is not the end of a period or is too short a time before the end of a period, the notice will be effective to terminate the lease at the earliest possible date after the date stated.' [Citation.] *** The purpose underlying a notice requirement is to provide

-11-

the parties with sufficient time to adjust their affairs before the actual termination. [Citation.] If the notice informs the tenant that the landlord wants him to quit the premises, then the question should not be the validity of the notice, but rather, how soon the tenant must leave." *Steffen v. Paulus*, 125 Ill. App. 3d 356, 359 (1984).

¶ 36    Here, since it is readily apparent from the language in the notice to vacate that it informed Lincoln that Spatz wanted it to leave the premises, the trial court correctly granted possession to plaintiff. See *Meyer v. Cohen*, 260 Ill. App. 3d 351, 361 (1993) (notice to vacate is sufficient if it adequately informed the tenant of landlord's intention to terminate the tenant's right of possession). Further, since plaintiff did not file its forcible entry and detainer action until July 6, 2009, after more than 30 days from service of its notice to Lincoln, and after the last day of June, its action was not rendered premature by the notice to vacate, even if Lincoln did have until June 30, 2009 to vacate the premises. *Cf. Avdich v. Kleinert*, 69 Ill. 2d 1, 6 (1977) (where landlord chose to give tenant five days to vacate the premises, action for forcible entry and detainer was premature before the end of those five days).

¶ 37    We are similarly unpersuaded that Spatz extended the lease and created a month-to-month tenancy by accepting rent after sending the notice and by allowing Lincoln until after the expiration date to leave the premises. While there is some dispute as to whether Lincoln paid actual "rent" to Spatz, or only the water bill, we need not address it. It is the intention of the landlord, not the tenant, that determines whether a holdover tenancy is to be created. *Troccoli v. L&B Products of Illinois, Inc.*, 189 Ill. App. 3d 319, 321 (1989). Although a landlord's acceptance of rent following the expiration of a lease may indicate the landlord's intention to treat the tenant as a holdover, other facts and circumstances bearing on the landlord's intent, such as efforts to regain possession of the property, must also be considered. *Id.* at 321-22. Here, not only does the lease unequivocally state that no receipt of money by the landlord after the lease expired is to be construed as an extension, but Spatz filed the present forcible entry and detainer action to regain possession of the premises just after a month once the lease expired. Under these circumstances, we conclude that Spatz did not intend to extend the lease, and its acceptance of payments from Lincoln, even coupled with its willingness to allow Lincoln until June 19, 2009 to vacate the premises, did not create a holdover tenancy. See *id.* at 322.

¶ 38    Defendants next contend that the trial court erred in awarding a judgment of attorney fees in favor of plaintiff. Reiterating their initial argument, defendants maintain that since the lease was extinguished when they exercised their option to purchase the property, and plaintiff's right to recover attorney fees only applies to actions to enforce its rights under the lease, plaintiff is not entitled to such fees. Having concluded above that defendants did not effectively exercise their option to purchase under their right of first offer, we need not address this argument. Defendants, nevertheless, argue that even if they did not exercise their right to purchase the property, awarding attorney fees to plaintiff was still erroneous because the lease agreement which provided for such fees in an action to enforce the lease had already expired when plaintiff filed its complaint.

¶ 39    Plaintiff responds that the trial court was correct in awarding attorney fees because this entire case was centered on enforcement of the lease, including Lincoln's rights and obligations under paragraph 28, as well as its obligation to move at the end of its term. On

cross-appeal, plaintiff contends that the trial court erred in reducing the attorney fees award from $91,554.40 to $50,000 because nothing on the record shows that the fees were not reasonable.

¶ 40 Trial courts have broad discretionary powers when it comes to awarding attorney fees, and its decision will not be reversed absent an abuse of discretion. *Richardson v. Haddon*, 375 Ill. App. 3d 312, 314 (2007). Thus, contract provisions governing attorney fees are to be strictly construed and enforced at the trial court's discretion. *Mirar Development, Inc. v. Kroner*, 308 Ill. App. 3d 483, 488 (1999). While we review *de novo* the trial court's interpretation of such provisions, our review of the court's judgment in applying them to the facts of the case is based on an abuse of discretion standard. *Peleton, Inc. v. McGivern's, Inc.*, 375 Ill. App. 3d 222, 225-26 (2007). Furthermore, when assessing the reasonableness of fees, a trial court may consider a multitude of factors, including the nature of the case, its difficulty level, the skill and standing of the attorney, the degree of responsibility required, the usual and customary charges for similar work, and the connection between the litigation and the fees charged. *Richardson*, 375 Ill. App. 3d at 314-15. However, when a trial court reduces the amount requested in a fee petition, its ruling should include the reasons justifying such a reduction. *Id.* at 315.

¶ 41 In this case, there is no dispute that the lease required Lincoln to pay for its landlord's attorney fees incurred in enforcing Lincoln's obligations under the lease. While the lease had expired by the time plaintiff filed the present action, it appears that the action was brought to enforce plaintiff's rights under paragraph 14 of the lease, which provides that "upon termination of this [l]ease, [Lincoln] shall surrender possession and vacate the premises immediately and deliver possession thereof to [l]andlord." We, therefore, conclude that the trial court did not abuse its discretion in awarding plaintiff attorney fees. See, *e.g.*, *Coldwell Banker Havens, Inc. v. Renfro*, 288 Ill. App. 3d 442, 448-49 (1997) (while contract containing provision for attorney fees' award had terminated when the suit was brought, those fees should have been awarded in an action relating to that contract).

¶ 42 With respect to the trial court's decision to reduce the fees from $91,554.40 to $50,000, we note that defendants pointed to numerous items on plaintiff's counsel's invoice which appear to have been incurred in matters unrelated to the enforcement of the lease. Those costs, such as "draft 2-615 motion to include arguments as to Wendy and VGT," could have been incurred in representing VGT or William and Wendy personally, and in defending from Lincoln's counterclaim and third-party claims. Other items, such as "meeting with client at client office," do not clearly indicate that they were incurred in plaintiff's enforcement of the lease. However, if the trial court had stricken from plaintiff's petition only the fees which were specifically challenged by defendants, it would have reduced the fee to $55,575.18, rather than $50,000. Further, the trial court's written order stated that the plaintiff's counsel's hourly rates were reasonable, but did not provide an objective basis justifying the fee reduction or explaining the rationale behind the amount by which they were reduced. Accordingly, we remand this matter for a petition hearing before the circuit court. See, *e.g.*, *Richardson*, 375 Ill. App. 3d at 315-16 (matter remanded where trial court failed to provide its basis for a drastic fee reduction).

¶ 43 Lastly, plaintiff contends, also on cross-appeal, that the trial court erred in denying

Spatz's holdover claim when it failed to address that claim, in which plaintiff sought to recover double rent from defendants as provided by section 9-202 of the Code. See 735 ILCS 5/9-202 (West 2008). Plaintiff does not dispute that under current Illinois law, a tenant is not to be charged double rent under the holdover statute if it remains in possession of the premises for "colorably justifiable reasons." See *J.M. Beals Enterprises, Inc. v. Industrial Hard Chrome, Ltd.*, 271 Ill. App. 3d 257, 261-62 (1995). Instead, plaintiff maintains that the holding in *J.M. Beals Enterprises*, 271 Ill. App. 3d 257, does not address what should happen in a case where a tenant "should know" that its actions in remaining on the premises are improper. Plaintiff further argues that this court should enunciate a brighter line by holding tenants liable for double rent unless they take legal action to protect their alleged rights to the premises before the landlord filed a forcible entry and detainer action.

¶ 44    As this court recognized in *J.M. Beals Enterprises*, 271 Ill. App. 3d at 261, section 9-202 of the Code requires the payment of "double the yearly value of the lands" only to tenants who are "willfully holding over." *Id.* at 259 (quoting 735 ILCS 5/9-202 (West 1992)). It then noted that courts of this State have long interpreted that language to mean that even a tenant's intentional holding over of the premises after the lease expired does not fall within the statute unless his actions were " '*knowingly and willfully wrongful*,' " such that the tenant does not incur the double rent penalty if he remained on the premises under "a reasonable belief that he was doing so rightfully." (Emphasis in original.) *J.M. Beals Enterprises*, 271 Ill. App. 3d at 261 (quoting *Stuart v. Hamilton*, 66 Ill. 253, 255-56 (1872)). The reason for such requirements is that the statute is highly penal, such that recovery can only be granted when the landlord strictly complies with its terms. *Stride v. 120 West Madison Building Corp.*, 132 Ill. App. 3d 601, 605 (1985). Accordingly, a landlord is not entitled to double rent when the tenant did not retain possession of the premises in bad faith, such as there is a bona fide dispute as to such rights to possession. *Id.* at 606.

¶ 45    Here, defendants' affirmative defense to plaintiff's action, after they dismissed their counterclaims and third-party claims, indicate that there was a legitimate dispute as to whether Lincoln had the right to remain on the premises as a vendee. Contrary to plaintiff's argument, defendants' failure to assert their alleged rights until after plaintiff filed its action does not amount to the willfulness, or bad faith, as would be required for the plaintiff to recover double rent under section 9-202. In light of the rationale of this court's prior holdings, we decline to change the current law as plaintiff suggests and conclude that the trial court did not err in declining to award plaintiff double rent under the statute.

¶ 46    For the foregoing reasons, we affirm in part the judgment of the circuit court of Cook County and remand in part for further proceedings on plaintiff's petition for attorney fees.

¶ 47    Affirmed in part and remanded in part.