NOTICE
Decision filed 09/26/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 230689-U

NO. 5-23-0689

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| SUPREME CARPENTRY AND DRYWALL, LLC, | ) | Appeal from the Circuit Court of Madison County. |
| Plaintiff-Appellee, | ) | |
| v. | ) | |
| CONTEGRA CONSTRUCTION CO., | ) | No. 18-L-330 |
| Defendant and Counterplaintiff-Appellee, | ) | |
| and | ) | |
| TRAVELERS PROPERTY CASUALTY INSURANCE COMPANY OF AMERICA, | ) | Honorable Sarah D. Smith, |
| Defendant and Counterdefendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Justices Cates and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court erred in granting summary judgment in favor of Contegra and denying Travelers' motion for summary judgment. The insurance policy controlled the claims process for the loss. We reverse the circuit court's order of August 16, 2023, and enter judgment in favor of Travelers, and remand for further proceedings on the remaining claims.

¶ 2    The defendant and counterdefendant, Travelers Property Casualty Insurance Company of America (Travelers), appeals the August 16, 2023, judgment of the circuit court of Madison County in favor of the defendant and counterplaintiff, Contegra Construction Co. (Contegra), on

1

a complaint for a breach of contract, and against Travelers on its cross-motion for summary judgment. Travelers raises several issues on appeal, including: (1) whether the circuit court erred in determining that Travelers, Contegra, and Supreme Carpentry and Drywall, LLC (Supreme) entered into a time and materials contract that was separate from the insurance policy and that was later breached by Travelers; (2) whether the circuit court erred in determining that the appraisal award did not affect the time and materials contract; and (3) whether the circuit court erred in determining that Contegra's action was not time barred. For the following reasons, we reverse the circuit court's order of August 16, 2023, and enter judgment in favor of Travelers.

¶ 3                                  I. BACKGROUND

¶ 4        Contegra is a construction company located in Edwardsville, Madison County, Illinois. In early 2015, Contegra was the general contractor on a senior living development (the Project) in Acworth, Georgia. The Project's concierge building used modular construction. The 44 living units were built in a factory, complete with interior finishing elements, and then shipped to Georgia for installation as part of the Project.

¶ 5        On March 25, 2015, Travelers issued a commercial insurance policy for builders' risk coverage (the Policy) to Contegra for the job site located in Acworth, Georgia, for the period of March 25, 2015, through February 25, 2016. The Policy listed the named insured as Contegra. A certified copy of the Policy is included in the record before us. The Policy was a custom insurance policy prepared for Contegra that is made up of several coverage forms, endorsements, and schedules. Relevant to this appeal, the Policy contained, *inter alia*, the following provisions which are identified by the title given by Travelers to the form, endorsement, or schedule.

¶ 6        The "COMMON POLICY CONDITIONS" portion of the Policy contained, *inter alia*, the following:

"**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only be endorsement issued by us as part of this policy." (Bold in original.)

¶ 7    The portion of the Policy titled "COMMERCIAL INLAND MARINE CONDITIONS" contained the following:

"The following conditions apply in addition to the Common Policy Conditions and applicable Additional Conditions in Commercial Inland Marine Coverage Forms:

LOSS CONDITIONS

***

B. Appraisal

If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

1.    Pay its chosen appraiser; and

2.    Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny this claim.

GENERAL CONDITIONS

F. Valuation

The value of the property will be the least of the following amounts:

1. The actual cash value of the property;

2. The cost of reasonably restoring that property to its conditions immediately before loss or damage; or

3. The cost of replacing that property with substantially identical property.

In the event of loss or damage, the value of property will be determined as of the time of loss or damage."

¶ 8    The portion of the Policy titled "CONSTRUCTION PAK — BUILDERS' RISK COVERAGE FORM" provides, in relevant part, as follows:

"E. ADDITIONAL CONDITIONS

The following conditions apply in addition to the COMMERCIAL INLAND MARIN CONDITIONS and the COMMON POLICY CONDITIONS.

* * *

15. Valuation

The Valuation GENERAL CONDITION in the COMMERCIAL INLAND MARINE CONDITIONS is replaced with the following:

Valuation

In the event of loss or damage, the value of Covered Property at the time of loss or damage will be determined as follows:

a. At replacement cost as of the time of loss or damage, except as otherwise provided in this Valuation GENERAL CONDITION. Replacement cost is the cost to replace Covered Property at the time of loss or damage without deduction for depreciation.

(1) You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim on a replacement cost basis if you notify us of your intent to do so within 180 days after the loss or damage.

(2) We will not pay on a replacement cost basis for any loss or damage:

    (a)    Until the lost or damaged property is actually repaired or replaced; and

    (b)    Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

* * *

c. We will not pay more for loss or damage on a replacement cost basis than the lease of the following subject to Paragraph d. below

(1) The Limit of Insurance applicable to the lost or damaged property;

(2) The cost to replace, at the same job site, the lost or damaged property with other property;

    (a) Of comparable material and quality; and

    (b) Used for the same purpose, or

(3) The amount you actually spend that is necessary to repair or replace the lost or damaged property.

(4) The cost to replace Covered property includes:

(a) Labor and delivery charges; and

(b) General and specific overhead and profit:"

¶ 9 The endorsement titled "Illinois Changes" provides:

"This endorsement modifies insurance provided under the following part:

COMMERCIAL INLAND MARINE COVERAGE PART

* * *

D. General Condition **C. Legal Action Against Us** in the Commercial Inland Marine Conditions is replaced by the following:

**C. Legal Action Against Us**

No one may bring a legal action against us:

1. Until there has been full compliance with all terms of this Coverage Part; and

2. More than 2 years after you first have knowledge of the direct loss or damage. But we will extend this 2 year period by the number of days between the date proof of loss is filed and the date the claim is denied in whole or in part." (Bold in original.)

¶ 10 In December 2015, a storm struck the Project. A temporary roof covering the modular units failed, resulting in water damage to the units. Contegra filed a claim with Travelers for coverage under the Policy. In January 2016, Travelers determined the storm damage to the Project was a covered loss under the Policy. On February 22, 2016, Jim Ellis, a Travelers general adjuster, was assigned to serve as Travelers' claim representative on Contegra's claim.

¶ 11 As the original Project used modular units manufactured at a factory, consideration was given whether to demolish the damaged units and replace them with new modular units to be manufactured and shipped for installation or to mitigate the damaged units to salvage what was

6

possible, demolish the remainder, and reconstruct the units on site. The latter option was agreed to by Travelers and Contegra.

¶ 12 Remediation of the damage consisted of two stages. First, mitigation and demolition of the damaged elements was required. Then, the damages could be repaired and/or replaced. The mitigation and demolition work was substantially completed by April 8, 2016. The mitigation and demolition work was performed by T. McDonald LLC. There was a dispute regarding payment for the mitigation and demolition costs which was settled and is not a part of this cause of action.

¶ 13 Contegra selected Supreme to perform the reconstruction work for the drywall, carpentry, and painting work. Tony McDonald is the president of Supreme and T. McDonald LLC.

¶ 14 On March 22, 2016, Ellis met with Brad Barnard from Contegra, Tony McDonald from Supreme, Michael Whitford from IN-Line Consulting (IN-Line), and Jerry Maran, the site manager, at the Project site in Georgia. On March 24, 2016, Barnard emailed Ellis and stated, "As we discussed, the reconstruction will be handled on a T&M[1] basis." There was some dispute about when the agreement about T&M was reached; however, on April 19, 2016, Ellis emailed Barnard and stated, "Travelers will agree to compensate for this work on a T&M basis by installing a clerk on the jobsite, meaning we will have an auditor from IN-Line Consulting on site during the restoration process to monitor costs while the job is ongoing." In the same email, Travelers requested a meeting to discuss labor rates and general conditions.

¶ 15 On April 25, 2016, Ellis, Barnard, McDonald, and Whitford attended a meeting at Contegra's office located in Edwardsville, Illinois. At the meeting, a trade labor sheet was agreed upon.

_____

[1]"T&M" is used to refer to time and materials. The parties agreed that the phrase "time and materials basis" and/or "T&M" is commonly used in the construction industry to mean the hours of labor, supervision, and project management performed will be tracked and then billed at an agreed-upon rate, and the materials will be billed at cost.

7

¶ 16    On April 29, 2016, Ellis sent an email to Barnard and McDonald, which stated, *inter alia*, as follows:

"Brad [Barnard] and Tony [McDonald],

Attached you will find the following:

\* \* \*

- Contegra's general conditions, with comment regarding markups for the trades highlighted on page 1

**Reconstruction at Acworth Village:** Travelers is in agreement with the rates presented on the attached rate sheet. Per our meeting on April 25, Travelers is in agreement with the general conditions outlined in the 'GC' attachment. Travelers agrees to a 20% overall markup on mitigation and reconstruction, however it was agreed that markups will not apply to charges for the Project Executive, Manager and Engineers, as well as management trip expenses and the Field Superintendent. Brad [Barnard], please confirm these agreements as they have been stated in this paragraph.

Mike Whitford and Mike MacKannon are ready to be onsite this Monday morning, May 2, to begin the process of clerking the reconstruction work at Acworth Village. They are in touch with Jerry Maran regarding the commencement of clerking. As the process moves forward we will keep you posted if any additional information is required to complete our review of reconstruction costs.

\* \* \*

Tony [McDonald] and Brad [Barnard], please review this information and let me know if either of you have any questions." (Bold in original.)

¶ 17    The reconstruction work began in May 2016. Supreme performed much of the reconstruction work, including the carpentry, insulation, drywall installation, drywall taping, drywall finishing, painting, wallcovering, trim, cabinets, and countertops. Contegra retained subcontractors other than Supreme to perform working including electrical, plumbing, and HVAC.

¶ 18    From May 2016, through September 2017, Supreme billed Contegra on a T&M basis for the reconstruction work it performed. Contegra, in turn, submitted the invoices and requested payment from Travelers. In total, Contegra submitted seven invoices, which included labor and materials costs provided by Supreme and other subcontracts, totaling $5,185,437.37 to Travelers for reimbursement of the reconstruction costs.

¶ 19    Throughout the reconstruction process, Travelers used IN-Line to monitor the reconstruction work and opine on whether the costs billed were reasonable and necessary. IN-Line identified issues with the invoices submitted and the work performed and recommended a reduced payment from Travelers to Contegra for the invoices submitted. Based on the opinions and recommendations from IN-Line, Travelers issued payments on the submitted invoices totaling $3,717,063.85. Contegra argued it was entitled to receive the remaining amount of $1,468,373.52.

¶ 20    As Travelers and Contegra had a dispute over the amount of reconstruction costs to be paid by Travelers, Travelers demanded that the dispute be submitted for appraisal under the terms of the Policy. Contegra did not object to the appraisal process. Travelers appointed Harrison Jones as its appraiser. Contegra appointed Joe Stella as its appraiser. Jones and Stella selected John Chianese as an umpire. On January 5, 2018, an appraisal award, signed by Jones, Stella, and Chianese, was issued that determined the total amount of loss for the reconstruction, excluding the mitigation and demolition, was $3.9 million. On January 23, 2018, Travelers issued a payment of

$182,936.15 to Contegra to bring the total of Travelers payments for the reconstruction to the awarded amount of $3.9 million.

¶ 21 On March 8, 2018, Supreme filed a complaint against Contegra and Travelers alleging breach of contract against Contegra, tortious interference with contractual rights against Travelers, and breach of contact against Travelers. On July 6, 2018, Supreme filed its first amended complaint which consisted of four counts. Count I alleged that Contegra breached the subcontract that was entered into by Contegra and Supreme. Count II alleged an action for unjust enrichment against Contegra. Count III alleged that Travelers tortiously interfered with the subcontract between Contegra and Supreme. Count IV alleged that Travelers breached the three-party contract that was alleged to have been created by Ellis's email sent on April 29, 2016. Contegra and Travelers each filed motions to dismiss the first amended complaint, which were originally denied. On May 1, 2019, the circuit court, upon a motion for reconsideration, granted Travelers' motion to dismiss count IV of the first amended complaint. The motions to dismiss counts I, II, and III of the first amended complaint were denied.

¶ 22 On July 5, 2019, Contegra filed its answer to the first amended complaint with affirmative defenses and a counterclaim against Supreme. On February 23, 2021, after being granted leave of court, Contegra filed an amended answer to the first amended complaint with affirmative defenses and a counterclaim against Supreme and a counterclaim against Travelers. The Contegra counterclaim against Travelers alleged, *inter alia*, that "[b]y no later than April 29, 2016, the terms of the builder's risk policy Travelers issued Travelers [*sic*] to Contegra, concerning how Travelers would pay for the reconstruction work, were [*sic*] modified by the agreement reached among Travelers, Contegra and Supreme."

10

¶ 23    After the matter proceeded with discovery, the parties filed cross-motions for summary judgment. On August 9, 2022, Contegra filed its motion for partial summary judgment on count I of its counterclaims against Travelers. On August 11, 2022, Supreme filed its motion for partial summary judgment on count IV of its first[2] amended complaint. On November 1, 2022, Travelers filed a motion for summary judgment against Contegra regarding its contract for breach of contract. Travelers argued that the Policy's appraisal clause and "actions against us" provisions barred the suit brought by Contegra, and that a new three-party contract was not created. On November 2, 2022, Travelers filed a motion for summary judgment against Supreme regarding count III of the first amended complaint alleging tortious interference with contract. The parties also filed memoranda, responses, and replies in support of their own motions and in opposition to those filed against them.

¶ 24    The circuit court conducted a hearing on, *inter alia*, the cross-motions for summary judgment on January 5, 2023, and took the matter under advisement. On August 16, 2023, the circuit court entered its 33-page-long written order titled "Findings of Fact, Conclusions of Law & Judgment." The August 16, 2023, order granted Contegra's motion for partial summary judgment against Travelers on its counterclaim for breach of contract and denied Travelers' motion for summary judgment against Contegra; based on the granting of Contegra's motion for partial summary judgment, the circuit court denied as moot Supreme's motion for partial summary judgment as to count IV of its second amended complaint against Travelers; granted Travelers' motion for summary judgment as to count III of Supreme's second amended complaint which

---

[2]Count IV of Supreme's first amended complaint was previously dismissed. Supreme was granted leave to file a second amended complaint on August 16, 2023, which alleged count IV against Travelers for the breach of the alleged contract between Supreme, Contegra, and Travelers. The parties agreed and stipulated that if Supreme's motion for leave to file second amended complaint was granted, the court would rule on Supreme's motion for summary judgment as to count IV of the second amended complaint.

11

alleged tortious interference with contractual rights; and pursuant to Illinois Supreme Court Rule 304(a), found there was no just reason for delaying either enforcement or appeal or both of the order.

¶ 25    On September 14, 2023, Travelers filed a timely notice of appeal. Additional facts will be presented, if necessary, in our analysis of this matter.

¶ 26                                    II. ANALYSIS

¶ 27    On appeal, Travelers challenges the grant of Contegra's motion for partial summary judgment and the denial of Travelers' motions for summary judgment against Contegra. Travelers argues that the circuit court erred in finding that a three-party time and materials contract was entered into by Travelers, Contegra, and Supreme, and said contract was not subject to the Policy. Further, Travelers argues that the Policy provisions regarding appraisal and time for filing suit are applicable and dispositive of the action in favor of Travelers.

¶ 28    "Rulings on motions for summary judgment are reviewed *de novo*." *Village of Bartonville v. Lopez*, 2017 IL 120643, ¶ 34. Motions for summary judgment are governed by section 2-1005 of the Code of Civil Procedure, which provides that summary judgment should be granted only where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2020). Further, the interpretation of contracts, including insurance policies, is reviewed *de novo*. *Kuhn v. Owners Insurance Co.*, 2024 IL 129895, ¶¶ 14-15.

¶ 29    "When parties file cross-motions for summary judgment, they agree that only a question of law is involved and invite the court to decide the issues based on the record." *Pielet v. Pielet*, 2012 IL 112064, ¶ 28. "[R]eview of an order denying a motion for summary judgment is proper

12

where the order also granted a cross-motion for summary judgment on the same claim or claims ***." *Wolfram Partnership, Ltd. v. La Salle National Bank*, 328 Ill. App. 3d 207, 216 n.2 (2001).

¶ 30                                            A. The Policy Controls

¶ 31    Contegra purchased the Policy from Travelers in March 2015 for coverage for the Project. The Project suffered a loss due to storm damage in December 2015, and an insurance claim was made by Contegra to Travelers. Email correspondence was sent from a representative of Travelers to representatives of Contegra and Supreme in April 2016. Contegra argues that the Policy was replaced by a three-party contract entered into via the aforementioned email correspondence.

¶ 32    "An insurance policy is a contract between an insurer and insured, and the rights and obligations of an insurer are primarily determined by the terms of that contract." *Country Mutual Insurance Co. v. Teachers Insurance Co.*, 195 Ill. 2d 322, 328 (2001). "[T]he general rules governing the interpretation of other types of contracts also govern the interpretation of insurance policies." *Farmers Automobile Insurance Ass'n v. Coulson*, 402 Ill. App. 3d 779, 780 (2010). We are to apply the policy as written if the policy language is unambiguous and comports with public policy. *Id.*

¶ 33                                          1. Time & Materials Agreement

¶ 34    During the claim process, a meeting was held on April 25, 2016, to discuss labor rates for handling the payment for the reconstruction phase of the claim on a T&M basis. This meeting included representatives from Travelers and Contegra as well as those involved in the claim process, IN-Line and McDonald. Following the meeting, email correspondence was sent confirming that labor rates were agreed upon. Additionally, the email noted that "if any additional information is required to complete [Travelers'] review of reconstruction costs," they would let Contegra know what is needed.

13

¶ 35    Contegra argues that the T&M agreement created an entirely new contract that replaced the insurance policy. Travelers acknowledged that an agreement was reached regarding paying on a T&M basis; however, it argues that neither a new contract was created nor was the Policy modified because Travelers did not issue an endorsement to the Policy.

¶ 36    The Policy at issues, contains, *inter alia*, the following:

"COMMON POLICY CONDITIONS

* * *

**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us as part of this policy." (Bold in original.)

¶ 37    We must interpret this "Changes" clause to determine its effect on the present dispute. The second sentence of the "Changes" clause states, "The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent." This sentence prohibits the insured from making unilateral changes to the Policy without the consent of the insurer. *Cincinnati Insurance Co. v. River City Construction Co.*, 325 Ill. App. 3d 267, 273 (2001). However, it would contravene public policy to interpret this clause in such a way that would allow the insurer to consent to a change in writing, but ultimately prevent the agreed-upon change from being enforceable by the insurer's failure to issue an endorsement of its own policy. A reasonable interpretation of the third sentence, which states, "This policy's terms can be amended or waived only by endorsement issued by us as part of this policy," is that the insurer

14

may unilaterally change the policy by endorsement issued by it, assuming consideration was provided to the insured for the change.

¶ 38 Based on our interpretation of the Policy and review of the email correspondence attached as exhibits to the motions for summary judgment and the depositions, we find that Travelers and Contegra modified the Policy by written agreement. The agreement to use a T&M basis modified the valuation portion of the Policy that provided that "the value of Covered Property at the time of loss or damage will be determined *** [a]t replacement cost *as of the time of loss or damage*." (Emphasis added.) The T&M agreement modified the timing aspect of the Policy from valuing the loss from the date of loss, such as using an estimate, to over the course of the reconstruction and submitting invoices as the reconstruction progressed.

¶ 39 The circuit court erred when it determined a new contract was entered into that replaced the Policy. Accordingly, we reverse the order of the circuit court granting summary judgment in favor of Contegra and against Travelers. The T&M agreement only modified the portion of the Policy regarding valuation and the remainder of the Policy must be examined to resolve this dispute. Further, having reversed the summary judgment in favor of Contegra, we may enter judgment for Travelers. *West Suburban Bank v. City of West Chicago*, 366 Ill. App. 3d 1137, 1146 (2006).

¶ 40                                    2. Appraisal Provision

¶ 41 Having determined the Policy controls, we turn to the appraisal provision:

"B. Appraisal

If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an

15

umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

1.      Pay its chosen appraiser; and

2.      Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny this claim."

¶ 42    "[A]n appraisal clause is analogous to an arbitration clause and is enforceable in a court of law in the same manner as an arbitration clause." *Travis v. American Manufacturers Mutual Insurance Co.*, 335 Ill. App. 3d 1171, 1173 (2002). While appraisal clauses and arbitration clauses are similar, the appraisal process is a more limited process than arbitration. *FTI International, Inc. v. Cincinnati Insurance Co.*, 339 Ill. App. 3d 258, 260 (2003). Typically, the appraisal process involves giving facts to the designated appraisers for a determination of the amount of loss under an insurance policy. *Id.*

¶ 43    In this matter, Travelers invoked the appraisal clause within the Policy. Contegra participated in the appraisal process without objection and without the need for judicial intervention to determine if participation in the appraisal process was required. On January 5, 2018, the three appraisers submitted a unanimous appraisal award finding the value of the reconstruction to be $3.9 million. Following the appraisal award, Travelers made a final payment on January 23, 2018, which was accepted by Contegra. Following the appraisal award, Contegra did not seek to vacate the appraisal award. Almost 18 months later, Contegra filed its counterclaim alleging a breach of contract.

16

¶ 44    We find that the Policy is unambiguous and contained a valid and enforceable appraisal provision. Contegra and Travelers submitted to appraisal without the need for judicial intervention to compel appraisal or for the appointment of a neutral appraiser. Per the language of the Policy, a decision of two or more appraisers is binding on the parties. The appraisal award was unanimous. Accordingly, the appraisal was binding on the parties and fully resolved the valuation of the reconstruction portion of the claim. As such, we enter judgment in favor of Travelers on its motion for summary judgment. As the resolution of this issue is dispositive, we decline to review Travelers' other argument on the portion of the Policy regarding legal action filed against Travelers.

¶ 45                              B. Motion to Strike Travelers' Brief

¶ 46    Contegra filed a motion to strike Travelers' brief, or alternatively, to disregard portions of appellant's brief, for failure to follow Illinois Supreme Court rules. Travelers filed an objection to the motion. We ordered that the motion would be taken with the case. Having considered the motion, we deny the motion to strike.

¶ 47                              III. CONCLUSION

¶ 48    For the foregoing reasons, we reverse the order of the circuit court of Madison County granting summary judgment in favor of Contegra and enter judgment in favor of Travelers. We remand the matter to the circuit court for the remaining claims between Supreme and Contegra.

¶ 49    Reversed and remanded.

17